NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

STATE OF ALASKA,

Appellant,

v.

JASON LEE CARLSON,

Appellee.

Court of Appeals No. A-11636
Trial Court No. 3AN-07-12263 CI

O P I N I O N

No. 2641 — March 15, 2019

Appeal from the Superior Court, Third Judicial District, Anchorage, Jack Smith, and Frank A. Pfiffner, Judges.

Appearances: James J. Fayette, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellant. Glenda J. Kerry, Law Office of Glenda J. Kerry, Girdwood, under contract with the Office of Public Advocacy, Anchorage, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge ALLARD.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

The State appeals the superior court's decision to grant post-conviction relief to Jason Lee Carlson, who was convicted of second-degree murder for killing his best friend, George Featherly. Carlson was convicted following two trials in the superior court. At both of these trials, Carlson was represented by Allen Dayan, a private criminal defense attorney hired by Carlson's parents.

During the investigation of the homicide, Carlson (who was then seventeen years old) gave conflicting accounts of Featherly's death to the police. Chief among these accounts was Carlson's assertion that Featherly was shot by a black man named "B" or "Bee." But Carlson eventually told Dayan that these earlier accounts were false — that, in truth, Carlson accidentally shot Featherly while he was handling a pistol that Featherly had recently purchased.

After Carlson told Dayan that he shot Featherly by accident, Dayan arranged a new police interview for Carlson. At this interview, with Dayan's prompting and assistance, Carlson offered this new version of events to the police. (This interview was videotaped and later shown at Carlson's trials.) Despite Carlson's assertion that the killing had been accidental, the State charged him with first-degree murder (*i.e.*, intentionally killing Featherly).

Then, while Dayan and Carlson were preparing for trial, Carlson told Dayan that the "accidental shooting" version of events was false. Carlson informed Dayan that he intended to take the stand at trial and reaffirm his earlier assertion that Featherly was killed by a black man named B.

Despite Carlson's recantation of the police confession that Dayan had helped facilitate, Dayan continued to represent Carlson at both of his trials. At Carlson's first trial, the jury acquitted him of first-degree murder but was unable to reach a verdict on the charge of second-degree murder. At Carlson's second trial, he was convicted of second-degree murder.

Carlson later filed an application for post-conviction relief asserting that he received ineffective assistance of counsel from Dayan. Specifically, Carlson contended that Dayan acted incompetently when he failed to withdraw from the case after it became clear that Carlson intended to take the stand and repudiate the accidental shooting version of events that Dayan had actively facilitated and previously promoted as the truth.

The superior court ultimately granted post-conviction relief to Carlson. In its order granting relief, the superior court found that Dayan's active participation in Carlson's later repudiated videotaped confession constituted an "actual conflict of interest" that gave rise to a "non-rebuttable presumption of prejudice." The superior court also found that Dayan's failure either to withdraw from Carlson's case, or to at least seek a protective order that would have prevented the jury from knowing about Dayan's involvement in the now-repudiated videotaped confession, constituted ineffective assistance of counsel under *Risher v. State*.[1]

The State now appeals the superior court's decision, raising multiple claims of error. In its brief, the State attacks the superior court's analysis as unsupported by the record and legally flawed. For the reasons explained here, we agree with the State that the superior court's conflict analysis is flawed and, in key respects, unsupported by the evidentiary record. We therefore reverse that ruling. We also conclude that there are sufficient questions about the superior court's findings and legal reasoning on the ineffective assistance of counsel claim that a remand for further proceedings on that claim is required.

The State also raises three additional claims of error on appeal. The State argues first that Carlson's application for post-conviction relief was time-barred, and that the superior court erred when it allowed Carlson to pursue this application. We

_____

[1] *Risher v. State*, 523 P.2d 421 (Alaska 1974).

reject the State's arguments primarily on preservation grounds, and we affirm the superior court's timeliness ruling. The State also argues that Carlson was barred as a matter of law from raising any ineffective assistance of counsel claims against his trial attorney under our decision in *Arnett v. State*.[2] We disagree with the State's expansive reading of *Arnett*, and we affirm this aspect of the superior court's decision.

Lastly, the State argues that the superior court erred when it found that Carlson's appellate attorney was ineffective for failing to raise the issue of Dayan's effectiveness in Carlson's direct appeal. Carlson concedes that this aspect of the superior court's ruling is erroneous. This concession is well-taken, and we reverse this ruling.[3]

*Factual background and prior proceedings*

*The police investigation*

In the late evening of September 24, 1998, police found a vehicle parked on the side of King Street in Anchorage. The car's engine and headlights were running and the parking brake was engaged. Both front doors were open. Inside the car, the police discovered the body of seventeen-year-old George Featherly. Featherly's body was in the driver's seat, covered up by a jacket. Featherly had been killed by a single close-range gunshot to the back of his head. According to the medical examiner's testimony at trial, the gun must have been fired only "fractions of an inch" from Featherly's head.

---

[2]    *Arnett v. State*, 938 P.2d 1079 (Alaska App. 1997).

[3]    *See Barry v. State*, 675 P.2d 1292, 1295-96 (Alaska App. 1984) (noting that ineffective assistance claims "must ordinarily be litigated in post-conviction relief proceedings" because "the record of the trial proceedings will seldom conclusively establish incompetent representation").

During the initial investigation into Featherly's death, seventeen-year-old Jason Carlson — Featherly's best friend — came under suspicion. Carlson initially told police that he had lost track of Featherly at the nearby Dimond Center Mall around 7:30 p.m. on the day of the shooting. After the mall security tapes failed to corroborate Carlson's story, Carlson admitted to the police that he had been in Featherly's car when the shooting took place. Carlson told the police that he and Featherly had left the Dimond Center to purchase a gun from a man named "B" or "Bee" — and that B, after attempting to rob Featherly, shot him in the back of the head while Featherly was driving. According to Carlson's account, the car swerved, but Carlson was able to reach over, steer the car to the side of the road, and engage the emergency brake. As this was happening, another car going the other direction passed by.

In this second version of events, Carlson claimed that, after the shooting, he grabbed Featherly's Makarov pistol and shot B. Carlson also claimed that he jumped into the back seat and struggled with B. (Carlson would later recant this portion of his statement when he testified at his two trials.) Carlson also initially denied covering Featherly's body with the jacket, suggesting to the police that B must have done that.

Carlson told the police that B fled soon after the shooting, taking the murder weapon with him. Carlson then also fled, taking Featherly's Makarov pistol with him. Carlson told the police that when he got home, he hid the Makarov pistol in his house and he called Featherly's pager in an attempt to create a false alibi for himself. (The police were already aware of Carlson's call to Featherly's pager, and the police subsequently located the Makarov pistol in Carlson's house inside of a stereo speaker where Carlson had told the police he hid it.)

In the next few weeks, the police investigated Carlson's "B" version of events, but they were unable to find anyone who matched Carlson's description of B, nor anyone who had sought treatment for a gunshot wound that night. In their

– 5 –                                                                 2641

subsequent interviews with Carlson, the police were openly skeptical of this version of events. In one interview, the lead investigator, Detective Larry Arend, urged Carlson to tell the truth about what happened. Arend also told Carlson that it would be a "whole new ballgame" if Carlson had accidentally shot Featherly.

On October 20 Carlson's parents retained private criminal defense attorney Allen Dayan to advise Carlson in connection with the police investigation. Carlson at first told Dayan the same thing he told the police — that B shot Featherly. Dayan hired private investigators to try to locate B, and he passed on any leads to the police.[4]

A few weeks later, on November 6 Carlson's mother found what appeared to be a death threat outside Carlson's window. The death threat was composed of cut-out magazine letters that read "U will d [picture of an eye] 2nite II" — *i.e.*, "you will die tonight too." Carlson's mother gave the death threat to Dayan, who turned it over to the police shortly before Carlson's first trial — in early February, 1999. After the police received the death threat, they subjected it to forensic testing and discovered Carlson's fingerprints in the tape that was used to attach the letters to the paper. At trial, Carlson admitted that he fabricated the death threat note. He testified that he felt that the police were not doing enough to find B, and he hoped that the fake death threat would prompt them to step up their investigation.

On the same day that Carlson's mother found the fabricated death threat, the police located the driver of the oncoming vehicle that passed by Featherly's car after

---

[4] During the post-conviction relief discovery in this case, Carlson obtained recordings of Dayan's conversations with the police. None of these statements were played to the jury or known to Carlson prior to the post-conviction relief proceedings. In those recordings, Dayan can be heard expressing skepticism to Detective Arend about Carlson's "B" version of events, including questioning why B would not have just shot Carlson too. Dayan also disparages Carlson as "not terribly bright." The superior court refers to this recording in a footnote, although the superior court does not directly explain its significance to its analysis.

Featherly was shot. The driver, Heather Dickens, later testified at both of Carlson's trials.

In her trial testimony, Dickens described seeing Featherly's car erratically swerve, and she also described driving past the car and looking into the car as she passed. As Dickens looked into the car, she saw one man, who "looked like he was passed out," sitting in the driver's seat "with his head sort of back" and his hands on the steering wheel. She also saw another man with his head by the driver's right shoulder. It looked to Dickens as if this second man was leaning forward between the front seats with his body partially in the back seat.

Dickens admitted that she could not see fully into the back seat of the car, but she was certain that there was nobody in the front passenger seat, and that there were only two men in the car. Dickens was also "positive" that the man in the back seat was not black. (Carlson is not black.)

After interviewing Dickens on November 6, 1998, Detective Arend called Dayan and told him that the police had an eyewitness, and that the eyewitness saw only two men in the car and did not see any black man in the car. Arend also told Dayan that the district attorney's office was considering filing first-degree murder charges against Carlson.

Dayan informed Carlson of what he had learned from the detective. According to Dayan's testimony at the later post-conviction relief evidentiary hearing, Carlson responded to this information by asking, "What if it [*i.e.*, the shooting] was an accident?" In response, Dayan explained to Carlson that if he shot Featherly accidentally, he could face a charge of manslaughter or criminally negligent homicide, but that either of these charges was much less serious than the first-degree murder charge that the State was currently considering. According to Dayan, after he gave Carlson this explanation, Carlson told Dayan that the B story was not true, and that the truth was that

Carlson shot Featherly by accident. Carlson also told Dayan that he now wanted to tell the police the truth.

On November 9 Dayan contacted Detective Arend and told him that Carlson now admitted that he had been alone in the car with Featherly, and that he accidentally shot Featherly. Dayan told Arend that Carlson wanted to participate in another police interview, where he would confess to accidentally killing Featherly.

That same day, Dayan accompanied Carlson and his family to the police station — but, upon their arrival, Dayan requested that the interview be delayed for one more day. According to Arend's later trial testimony (which was not objected to by Dayan), Dayan told Arend that he "wanted to make sure that he had all of his T's crossed [and] I's dotted," and also to make sure that "what [Carlson] was telling him was the truth." Dayan told Arend that he (Dayan) was "pretty confident ... that what [Carlson] had told him was the truth, but he just wanted to make sure of it."

The next day, November 10, Dayan and Carlson returned to the police station for the interview. Arend conducted this interview, which was videotaped and audiotaped.

At the beginning of the interview, Detective Arend advised Carlson of his *Miranda* rights. Carlson waived his *Miranda* rights and confirmed that he was participating in the interview voluntarily, after consulting with his attorney (Dayan), who was present throughout the interview.

Carlson then proceeded to offer a new "accidental shooting" account of what happened. According to Carlson's new version of events, Carlson and Featherly were alone in Featherly's car when the shooting occurred. Carlson was sitting in the back seat and Featherly was driving on an unpaved section of King Street that was filled with potholes. Featherly had recently bought a gun, and Carlson was inspecting this gun, which he did not realize was loaded. Carlson told Arend that he was "screwing around"

with the gun and pointing the gun at Featherly when the gun suddenly went off, killing Featherly. Carlson also admitted that his finger was on the trigger when the gun discharged.[5]

Carlson told Arend that he panicked after the shooting. He admitted to Arend that he wiped down the car for fingerprints, and he also admitted (contrary to his prior statements) that he covered Featherly's body with a jacket so that it could not be easily seen. Carlson then fled with Featherly's two guns, throwing the gun that killed Featherly into a nearby creek and hiding the Makarov pistol in his home. The police later looked for a gun in the creek, but they could not find one.

Both the audio recording and the video recording of this November 10 confession show that Dayan was an active participant in the confession. At various points during the interview, Dayan encouraged Carlson to provide more details about this new version of events. Dayan also vouched for Carlson's claim that it was Carlson's habit to sit in the back seat even when no one was in the front passenger seat. In the interview, Dayan stated that he "[thought] the evidence will bear it out" that this was "just [Carlson's] habit and style; he likes to ride in the back seat."

Dayan was also an enthusiastic participant in the reenactment suggested by Detective Arend. Dayan agreed to play the role of Featherly in the reenactment. On the videotape portions of the interview shown to the jury at Carlson's second trial, Dayan can be seen scooting his chair around so that it is positioned in front of Carlson's chair, as though Dayan was sitting in the driver's seat and Carlson was in the back seat. Dayan can also be seen handing Carlson his cell phone and urging him to use the phone as a

---

[5] Carlson made a similar admission in an interview with a police polygrapher that was conducted after the recorded interview with Arend. According to the State's briefing on appeal, the results of the polygraph were "inconclusive." The fact that Carlson had submitted to a police polygraph was not told to the jury at either trial.

prop for the gun that killed Featherly. In the video, Carlson handles the "gun," but he does not place it directly against Dayan's head.

Following the videotaped confession, Carlson was allowed to leave the police station. But the next day Carlson was arrested and charged with first-degree murder, second-degree murder, and multiple counts of evidence tampering and weapons misconduct.

The grand jury later indicted Carlson on the following charges: one count of first-degree murder (for intentionally shooting Featherly); an alternative count of second-degree murder (for knowingly shooting Featherly under circumstances manifesting extreme indifference to human life); one count of evidence tampering for making the fake alibi phone call to Featherly's pager; a second count of evidence tampering for wiping off the fingerprints from the car; a third count of evidence tampering for laying Featherly's body on the seat and covering it with the jacket; a fourth count of evidence tampering for disposing of the murder weapon; a fifth count of evidence tampering for creating the fake death threat; one count of third-degree weapons misconduct for possessing the murder weapon (a concealable firearm) after having been adjudicated a delinquent minor for a crime that would have been a felony if Carlson had been an adult; and a second count of third-degree weapons misconduct for possessing Featherly's Makarov pistol after having been adjudicated a delinquent minor for a crime that would have been a felony if Carlson had been an adult.[6]

---

[6]  AS 11.41.100(a)(1)(A); AS 11.41.110(a)(2); AS 11.56.610(a)(1), (2) and/or (4); and AS 11.61.200(a)(1), respectively. Carlson had previously been adjudicated a delinquent minor for committing burglary (conduct that would have been a felony if he had been an adult).

*Carlson's recantation of the "accidental discharge" version of events*

Approximately one month after his arrest (*i.e.*, sometime in December 1998), Carlson called Featherly's father from jail. In his conversation with Featherly's father (which was recorded by corrections personnel), Carlson said that it was not true that he had shot Featherly, and he declared that he had given a false confession to the police. Carlson also falsely claimed that he had been receiving death threats. (Carlson later admitted at trial that his statement to Featherly's father about "death threats" was a reference to the fake death threat that he himself had created.)

Around this same time, Carlson called Dayan and told him that the accidental shooting story was not true — that, instead, the truth was his earlier assertion that B shot Featherly. Dayan testified at the post-conviction relief evidentiary hearing that Carlson had previously been very close to Featherly's family, and that Carlson was upset that Featherly's family blamed him for their son's death. The testimony at trial was that the two were "like brothers," frequently staying over at each other's houses.

Carlson told Dayan that, if his case went to trial, he intended to take the stand and testify that his videotaped confession was false and that B killed Featherly. However, with Carlson's permission, Dayan continued to try to negotiate a plea agreement with the State.

The plea negotiations ultimately broke down sometime in early February 1999, at which point it became clear that the case was headed to trial and that Carlson would take the stand and testify that B shot Featherly — thereby repudiating the videotaped confession that Dayan had arranged for and actively participated in.

Dayan did not move to withdraw as Carlson's counsel or take any steps to address the fact that the jury would likely become aware that the attorney who was representing Carlson at trial had previously promoted Carlson's accidental discharge

– 11 –                                                                                           2641

version of events as the truth. According to Dayan's testimony at the post-conviction relief evidentiary hearing, it never occurred to him to withdraw, nor did he see any reason to believe that Carlson would be better served by having a different attorney represent him at trial. Dayan also defended his performance as Carlson's trial attorney, and argued that the criticisms now being leveled against him were unfair.

*Carlson's first trial*

At Carlson's first trial, the prosecution's primary theory was that Carlson intentionally shot Featherly over a dispute involving money and/or a girl. In support of this theory, the prosecutor introduced evidence that Featherly owed Carlson $30 and that Featherly was dating (or possibly engaged to) a girl that Carlson used to date more than a year earlier.

During his opening statement, the prosecutor played portions of the videotape of the November 10 interview in which Carlson confessed to accidentally shooting Featherly. And in the State's case-in-chief, the prosecutor introduced the complete audio recording of this interview into evidence, but the prosecutor failed to introduce the corresponding videotape of the interview into evidence. This oversight was discovered when, during jury deliberations, the jurors asked to re-watch the portions of the videotape that they had been shown during the prosecutor's opening statement. The trial judge told the jurors that, while the audio recording was available, the videotape had not been introduced into evidence and was therefore unavailable for their review.

Carlson took the stand at his first trial and, as he had previously informed Dayan he would do, Carlson testified that B shot Featherly. Carlson admitted, however, that it was not true that he shot B in return. Carlson told the jury that he had lied about shooting and struggling with B because he felt that it was "cowardly" for him not to have

done so, and he felt "guilty" that he had done nothing to the man who killed his best friend.

Carlson also admitted that he had repeatedly lied about what happened, starting with his initial interview with the police where he claimed that he had not been present when Featherly was killed. Carlson testified that he later falsely confessed to accidentally shooting Featherly because he felt overwhelmed by the police investigation and he "just wanted everybody off my back." Carlson also stated that he thought that he would not get into any trouble if he claimed to have accidentally shot Featherly.

Carlson admitted that he engaged in most of the conduct that formed the basis for the evidence tampering and weapons misconduct charges. That is, Carlson admitted to making the fake alibi call to Featherly's pager, wiping down the car for fingerprints, covering Featherly's body with a coat, possessing the Makarov pistol, and making the fake death threat note that his mother found outside his window. However, Carlson denied that he ever possessed the gun that was used to kill Featherly, and he denied throwing that gun into the creek — conduct that was the basis for one of the weapons misconduct charges and one of the evidence tampering charges.

During his cross-examination of Carlson, the prosecutor focused primarily on the number of different lies that Carlson had told, and the prosecutor had Carlson admit that many of his prior statements were lies. Dayan subsequently argued in closing argument that, while the State had proved that Carlson was a liar, the State had not proved beyond a reasonable doubt that Carlson was a murderer.

After deliberating for several days and requesting multiple playbacks of the testimony (including the request to view the videotape of the November 10 confession that was denied because the videotape was not in evidence), the jury announced its verdicts. The jury acquitted Carlson of first-degree murder, rejecting the prosecutor's theory that Carlson had intentionally killed his best friend while his friend was driving

– 13 –

the car Carlson was riding in. However, the jury could not reach a unanimous verdict on the second-degree murder charge, and a mistrial was declared on that charge.[7]

The jury convicted Carlson of the four evidence tampering charges that he had admitted during his trial testimony, as well as the weapons misconduct charge related to the Makarov pistol, which Carlson had also admitted.[8] But the jury was unable to reach a verdict on the evidence tampering and weapons misconduct charges that Carlson had denied — charges that would have required the jury to find that Carlson personally handled the gun that killed Featherly.

According to Dayan's testimony at the post-conviction relief evidentiary hearing, both he and Carlson's family were "surprised" and "elated" by the jury's verdicts at Carlson's first trial. Dayan testified that it was clear from the jury's behavior during closing argument that his defense strategy of arguing that Carlson was a liar but not a murderer had resonated with the jurors.

*Carlson's second trial*

At the second trial, Carlson gave substantially the same testimony, although he provided some additional detail about why he told the police that he accidentally shot Featherly. According to Carlson, he falsely confessed to accidentally shooting Featherly because nobody would believe the truth — *i.e.*, that B shot Featherly. Carlson testified that Dayan told him that nobody would believe that B shot Featherly because Carlson had already "lied so much." Carlson also testified that Detective Arend's statement about an accidental shooting being a "whole new ballgame" led him to believe that he

---

[7] The jury was not instructed on any lesser included charges at the first trial. At the second trial, the jury was instructed on the lesser included charge of manslaughter.

[8] Carlson does not challenge these convictions in his application for post-conviction relief.

would not get into much trouble, if any, if he falsely told the police that the shooting was an accident.

The main difference between the two trials, however, was the shift in the prosecution's theory of the case. With first-degree murder no longer an option, the prosecutor argued that Carlson had told a basically truthful version of events during the November 10 confession — and that Carlson's accidental shooting of Featherly constituted second-degree murder because it manifested extreme indifference to the value of human life. The prosecutor told the jury, "Jason Carlson did the stupidest thing he's ever done in his life [when he held] a gun he didn't know ... was loaded to the back of George Featherly's head. The gun went off, and he's been lying about it ever since."[9]

At various points during the second trial, the prosecutor referred to Dayan's presence at the November 10 police interview. In closing argument, the prosecutor told the jury:

> [Y]ou've got the interview on the [10th] of November. It's on the videotape. This is in the presence of Mr. Dayan. With his own attorney there. After presumably he's had all the options laid out ... . Look, any promises, any threats? No.

In his closing argument to the defense, Dayan continued to argue that the State had proved Carlson was a liar but had failed to prove that he was a murderer. Dayan's closing argument also focused on various discrepancies in Heather Dickens's testimony, including the fact that she did not have a full view of the back seat. According to Dayan, what Dickens actually saw was Carlson after he moved out of the front seat so that he could grab the steering wheel after B shot Featherly.

Lastly, Dayan addressed the reasons why Carlson would falsely confess to accidentally shooting Featherly. Dayan emphasized Carlson's youth, and susceptibility

---

[9]   *See* AS 11.41.110(a)(2).

to pressure, arguing that Carlson was overwhelmed by the police investigation. Dayan also emphasized that Carlson was easily influenced by the adults around him — including both Detective Arend and Dayan himself.

Following its deliberations, the second jury convicted Carlson of second-degree murder and the two remaining evidence tampering and weapons misconduct charges.

### Carlson's sentencing

The trial judge sentenced Carlson to 50 years' imprisonment with 10 years suspended for the second-degree murder conviction. Carlson's composite sentence for the murder and the evidence tampering and weapons misconduct charges was 64 years' imprisonment with 17 years suspended (47 years to serve).

During the sentencing hearing, the trial judge expressly found that Carlson had perjured himself at his two trials. The judge declared that Carlson's story about a black man named B shooting Featherly was "patently false":

> I listened to it twice. I don't believe a word of it. There wasn't a B present. B didn't shoot anybody, and Mr. Carlson did not shoot B. He testified [that] all those things occurred, but they didn't, and he did commit perjury in telling that story.

### Carlson's direct appeal and subsequent federal litigation

Carlson appealed his murder conviction and his sentence. This Court affirmed Carlson's conviction and sentence on January 27, 2006.[10] The Alaska Supreme Court denied Carlson's petition for hearing on May 24, 2006.

---

[10] *Carlson v. State*, 128 P.3d 197 (Alaska App. 2006).

Around the time that the Alaska Supreme Court denied Carlson's petition for hearing, a private criminal defense attorney from North Carolina contacted the assistant public defender who represented Carlson in his direct appeal. The North Carolina attorney had seen this Court's decision on a national blog, and he volunteered to represent Carlson in a petition for writ of certiorari to the United States Supreme Court raising a *Blakely* sentencing issue.[11]

Carlson's public defender assisted the North Carolina attorney in contacting Carlson and having the North Carolina attorney take over the representation. But neither the public defender nor the North Carolina attorney advised Carlson that he had only one year to seek post-conviction relief in state court if he wanted to raise claims of ineffective assistance of counsel against Dayan or against his appellate attorney.[12] In addition, no one advised Carlson that the federal litigation with the North Carolina attorney would not toll this deadline.

The United States Supreme Court denied Carlson's petition for writ of certiorari in October 2006. The North Carolina attorney then assisted Carlson in filing a petition for writ of habeas corpus in the federal district court, attempting to raise ineffective assistance of counsel claims that could only be raised if Carlson had first exhausted his post-conviction relief remedies in state court.[13] A federal assistant public defender was appointed to represent Carlson in his federal habeas petition. That attorney requested that the federal district court stay the proceedings until Carlson had the opportunity to exhaust his state post-conviction relief remedies. The federal district court granted this request.

---

[11] *See Blakely v. Washington*, 542 U.S. 296 (2004).

[12] *See* AS 12.72.020(a)(3)(A).

[13] *See* 28 U.S.C. § 2254(b)(1)(A).

*Carlson's application for post-conviction relief*

On December 10, 2007 — six and one-half months after the statutory deadline for seeking post-conviction relief—Carlson filed a pro se post-conviction relief application in the superior court, raising various claims of ineffective assistance of counsel against Dayan. The superior court appointed counsel to represent Carlson and to address the late filing of the application. Carlson's post-conviction relief attorney filed a motion to accept the late-filed application, arguing that the delay had been caused by ineffective assistance of Carlson's state and federal appellate counsel.[14] Superior Court Judge Jack Smith granted this motion over the State's objection. (This ruling is challenged on appeal and discussed later in our opinion.) The case then proceeded to a litigation of the merits of Carlson's underlying post-conviction relief claims.

In his amended application for post-conviction relief, Carlson raised three primary claims of ineffective assistance of counsel against Dayan.[15]

---

[14] *See Alex v. State*, 210 P.3d 1225, 1228 (Alaska App. 2009) (suggesting that the statute of limitations could be equitably tolled in cases where the applicant mistakenly attempted to pursue his claim in another forum due to ineffective assistance of counsel); *see also Holland v. Florida*, 560 U.S. 631, 652 (2010) (recognizing that the statute of limitations for federal habeas corpus claims may be equitably extended to remedy the egregious performance of appointed counsel that contributed to the missed deadline).

[15] Carlson also raised ineffective assistance of counsel claims against his state appellate attorney, assistant public defender Paul Malin. Carlson alleged specifically that Malin was ineffective for failing to challenge the trial judge's denial of Carlson's post-trial pro se motion requesting that Dayan withdraw and the Alaska Public Defender Agency be appointed for sentencing. *Cf. Peterson v. State*, 1985 WL 1077992, at *2 (Alaska App. Mar. 6, 1985) (unpublished) ("[A] party retaining counsel may fire his attorney and retain new counsel at will, so long as substitution of counsel does not substantially prejudice the state."). On appeal, Carlson concedes that he abandoned this claim during the post-conviction relief proceedings.

In his first claim, Carlson alleged that Dayan was ineffective for advising Carlson to participate in the videotaped November 10 interview with the police without any guarantees of confidentiality or promises of leniency in place. This claim was dismissed by Judge Smith on the ground that the November 10 interview occurred before formal charges were filed, and the Sixth Amendment right to effective assistance of counsel does not attach until criminal charges have been filed.[16] Carlson has not cross-appealed the dismissal of this claim, and it is therefore not before us in this appeal.

In his second claim, Carlson alleged that Dayan was ineffective for failing to withdraw from his case once it became clear that Carlson intended to testify at trial that B shot Featherly, and that Carlson intended to repudiate the accidental shooting confession that Dayan had participated in and previously promoted as the truth. Carlson argued that any competent attorney under these circumstances would have withdrawn from his case or, at the very least, would have moved for a protective order to prevent

---

[16] *See, e.g.*, *Philmore v. McNeil*, 575 F.3d 1251, 1258-59 (11th Cir. 2009) (holding that Sixth Amendment right to counsel had not attached at the time defendant made his statements to the police because there had been no formal charge, preliminary hearing, indictment, or arraignment); *United States v. Edelmann*, 458 F.3d 791, 804 (8th Cir. 2006) (same); *Sweeney v. Carter*, 361 F.3d 327, 333-34 (7th Cir. 2004) (same); *People v. Claudio*, 629 N.E.2d 384, 385 (N.Y. 1993) (holding that, "except in most unusual circumstances," the state is not charged with responsibility of guaranteeing effective legal representation upon entry of counsel at preaccusatory, investigatory stage of a criminal matter, *i.e.*, before commencement of formal adversarial judicial criminal proceedings). *But see McNeil*, 575 F.3d at 1265-75 (Tjoflat, J., concurring) (explaining that defendant had no Sixth Amendment claim based on defense attorney's incompetent advice prior to initial charges being filed but defendant might have had due process claim under the Fifth Amendment); *United States v. Wilson*, 719 F. Supp. 2d 1260, 1267 (D. Or. 2010) (concluding that defendant's precharge plea negotiations were a "critical stage" of the criminal process for purposes of Sixth Amendment because prosecution had already committed to prosecution and parties' adverse positions had already solidified).

the jury from learning about the attorney's involvement in the earlier, now-repudiated confession.

Lastly, Carlson alleged that Dayan's involvement in the November 10 interview constituted an "actual conflict of interest" that adversely affected Dayan's performance at trial and which required the court to presume prejudice and reverse Carlson's convictions.

Carlson's case proceeded to a three-day evidentiary hearing on the latter two claims, which was held in front of Superior Court Judge Frank A. Pfiffner.

At this evidentiary hearing, Carlson presented an expert witness, long-time criminal defense attorney, John Murtagh. Murtagh testified that, in his opinion, Dayan acted incompetently in failing to either withdraw or move for a protective order. Murtagh acknowledged, however, that trying to redact all indications of Dayan's presence from the November 10 videotape would be "an elaborate project" — a project that Murtagh did not think "would work well" or provide "a complete solution." Murtagh therefore testified that he felt "very strongly" that Dayan should have withdrawn as Carlson's trial counsel. According to Murtagh, if Carlson had had a different trial attorney — one who "challeng[ed] the entire procedure of the [November 10] interview" and "develop[ed] in some exquisite detail Mr. Carlson's psychological mental state," this would have made it a "completely different trial." Murtagh acknowledged, however, that Carlson's multiple lies and shifting narratives would have made this a difficult case for any attorney.

For his part, Dayan actively defended his decision to continue representing Carlson at his two trials. According to Dayan, it was "nonsense" to claim that Carlson had been coerced into falsely confessing to accidentally shooting Featherly, either by Dayan or anyone else. In Dayan's view, Carlson's demeanor during the videotaped

confession belied such a claim: "You can tell he's not being pressured to lie there. It sounds like he's telling the truth."

Dayan testified that, after watching the videotaped interview again, he was reminded of the reasons why, at the time, he believed that the accidental discharge story was the truth. He further indicated that, sitting there at the evidentiary hearing, he still believed that the accidental discharge story probably was the truth. Dayan also expressed optimism about the result he could have obtained for Carlson if Carlson had not reverted to the B story.

Dayan disagreed with Murtagh's criticisms of his performance. Dayan testified that he had zealously and competently represented Carlson and he did not believe that Carlson was prejudiced by his representation at the two trials. Dayan also suggested that he shared Murtagh's view that any attorney would have had difficulty representing Carlson, given Carlson's many lies and shifting stories, which (according to Dayan) continued to shift in small ways up until the first trial.

Following this evidentiary hearing, the superior court issued a twenty-eight page written order. In this order, the court granted post-conviction relief to Carlson and vacated his convictions for second-degree murder, weapons misconduct, and evidence tampering from the second trial.

First, the superior court concluded that Dayan's active participation in the November 10 videotaped interview created an "actual conflict of interest" that gave rise to a "non-rebuttable" presumption of prejudice that required the court to reverse Carlson's convictions. Specifically, the court found that, because of Dayan's involvement in this interview, he became an "actual witness" in Carlson's case for purposes of Alaska Rule of Professional Conduct 3.7(a), and that Dayan's actions and statements during the videotaped interview were tantamount to "testifying" against his client in violation of that rule.

Second, the court concluded that Dayan rendered ineffective assistance of counsel when he failed to either withdraw from the case or at least to seek a protective order that would prevent the jury from learning of his involvement in the November 10 videotaped confession. The court found specifically that, had Dayan moved for a protective order, the motion would have been granted, and that this was "the minimum required for Carlson to have received a fair trial." The court also concluded that Dayan acted incompetently by failing to recognize that his presence at trial undermined Carlson's credibility and the credibility of the B defense. The court faulted Dayan for failing to take adequate steps to try to discredit the November 10 confession as a false and coerced confession, and the court concluded that a different attorney — one who was not directly involved in the now-repudiated confession — would have been better situated to make such an attack.

Although the court's order is twenty-eight pages long, the court spent only a page and a half on the prejudice prong of Carlson's ineffective assistance of counsel claim.[17] The court's analysis of the question of prejudice ultimately turned on its finding that a protective order would have been granted if one had been requested, and its finding that the jury at Carlson's first trial "did not see or hear" the November 10 interview, while the jury at the second trial saw the videotape of that interview and thus essentially "saw Dayan refute his [own] theory of the case." Based on these findings about the differences between the two trials, the court concluded that "there is a possibility that Dayan's support for the accident version and repudiation of the Bee version ... was an influential factor in the jurors' decision to convict."

_____

[17] To prove an ineffective assistance of counsel claim under the federal and state constitutions, a defendant must prove both incompetence and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984); *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974).

In addition to these rulings on Carlson's two main post-conviction relief claims, the superior court also made two other rulings that are challenged on appeal. First, the court rejected the State's argument that Carlson was barred as a matter of law from raising any claims of ineffective assistance of counsel against Dayan based on our prior decision in *Arnett v. State*.[18] Second, the court found that Carlson's state appellate attorney was ineffective for failing to raise an ineffective assistance of counsel claim against Dayan in Carlson's direct appeal. (As already noted, Carlson concedes that this last ruling was error.)

*The State's arguments on appeal*

The State raises multiple claims of error on appeal. Specifically, the State argues: (1) the superior court erred when it granted Carlson's motion to proceed on the merits despite the late filing of the application; (2) the superior court erred when it rejected the State's argument that, under this Court's decision in *Arnett v. State*, Carlson was barred from raising any ineffective assistance of counsel claims against Dayan; (3) the superior court's decision to grant post-conviction relief to Carlson was based on clearly erroneous findings regarding the difference between the two trials; (4) the superior court erred when it granted post-conviction relief to Carlson without finding case-specific prejudice to Carlson arising from Dayan's purported conflict of interest; and (5) the superior court erred when it found that Dayan violated the advocate-witness rule.

We now address each of these claims.

---

[18] *Arnett v. State*, 938 P.2d 1079 (Alaska App. 1997).

### A. *The superior court's timeliness ruling*

As already mentioned, Carlson's original pro se application for post-conviction relief was filed approximately six and one-half months after the statutory deadline.[19] Carlson's post-conviction attorney argued that this delay should be excused, alleging that Carlson received ineffective assistance of counsel from his appellate attorneys because neither of them warned Carlson of the post-conviction relief filing deadline or that this deadline would not be tolled by the intervening federal litigation.[20]

To support his claim, Carlson provided affidavits from Paul Malin, the assistant public defender who represented Carlson in his direct appeal, and Bruce Cunningham, the pro bono North Carolina attorney who represented Carlson in his petition for writ of certiorari to the United States Supreme Court and who assisted Carlson in filing his procedurally deficient petition for writ of habeas corpus in federal district court.

In his affidavit, Malin asserted that he believed that he had provided ineffective assistance of counsel to Carlson because "[i]t would be reasonable for

---

[19]   Under AS 12.72.020, a defendant who unsuccessfully appeals his conviction has one year from the date on which the appeal becomes final to file an application for post-conviction relief. *See* AS 12.72.020(a)(3)(A).

[20]   Although Carlson argues on appeal that he did not raise a claim of equitable tolling based on the ineffective assistance of his appellate counsel, we conclude that Carlson's claims necessarily encompassed the same fundamental due process principles as equitable tolling. *See Alex v. State*, 210 P.3d 1225, 1228 (Alaska App. 2009) (suggesting that the statute of limitations could be equitably tolled in cases where the applicant mistakenly attempted to pursue his claim in another forum due to ineffective assistance of counsel); *see also Holland v. Florida*, 560 U.S. 631, 649, 652 (2010) (holding that the statute of limitations for federal habeas corpus claims may be equitably extended to remedy the egregious performance of appointed counsel that contributed to the missed deadline).

[Carlson] to think that, as long as he was actively pursuing relief in the federal courts, his state post-conviction relief options would not be harmed."

Unlike Malin, Cunningham did not directly state that he had provided ineffective assistance of counsel. However, he admitted in his affidavit that he never discussed state post-conviction relief remedies with Carlson, and he also admitted that he was "not aware of Alaska's statute of limitations regarding PCR applications [because] in North Carolina we do not have a statute of limitations for post-conviction relief."

In response to these affidavits and the legal memorandum filed in support of Carlson's motion, the State filed a two-page opposition. In that opposition, the State argued that Carlson's application should be dismissed as time-barred. However, the State did not challenge any of the legal or factual assertions made in Carlson's pleadings. Instead, the State argued only that the pleadings showed that Carlson had been in communication with his attorneys and that he had made "a choice ... in consultation with his attorneys" to forgo his state post-conviction relief remedies, "presumably because he thought his chances for success were stronger in the federal system."

Carlson then filed a pleading asserting that he made no such choice; he also pointed out that it would be incompetent for an attorney to advise a defendant to skip litigating his post-conviction relief claims in state court when the availability of federal habeas review is directly contingent on a defendant having exhausted his state post-conviction relief remedies.[21]

Neither party requested an evidentiary hearing or oral argument on this timeliness determination. Instead, the matter was submitted to Superior Court Judge Jack Smith based solely on the arguments and assertions made in the pleadings.

---

[21]   *See* 28 U.S.C. § 2254(b)(1)(A).

Judge Smith subsequently issued an oral ruling granting Carlson's motion to proceed. In his ruling, Judge Smith excused Cunningham's failure to inform Carlson of the state post-conviction deadline, apparently concluding that Cunningham could not be expected to know the post-conviction relief procedures of a state in which he was not licensed. However, Judge Smith concluded that, under the circumstances, Malin was ineffective for failing to advise Carlson of the statutory deadline for seeking post-conviction relief. After Judge Smith issued this ruling, the parties proceeded to litigate the merits of Carlson's ineffective assistance of counsel claims against Dayan.

The State challenges Judge Smith's ruling on appeal, but the State relies on arguments that were never raised in the proceedings below. The State also violated the appellate rules by failing to have Judge Smith's oral ruling transcribed.[22] An appellant's failure to designate the portions of the record that are necessary for deciding a claim on appeal can constitute a waiver or abandonment of that claim.[23]

The timeliness of a post-conviction relief application is a threshold determination that must be made before the court undertakes litigation of the merits of

---

[22] Alaska Appellate Rule 210(b)(1)(A) requires the appellant to designate for transcription "all parts [of the record] which are essential to a determination of the issues on appeal." The rule further provides that "if appellant claims that the written findings of fact or conclusions of law are insufficient or erroneous, the designation shall include any oral findings of fact and conclusions of law." *Id.*

[23] *See Bertilson v. State*, 64 P.3d 180, 185 (Alaska App. 2003); *see also Miscovich v. Tryck*, 875 P.2d 1293, 1304 (Alaska 1994) ("It is well established that a party's failure to designate portions of the record that are necessary to allow the determination of a point on appeal will amount to a waiver or abandonment of that point."); *Jackson v. State*, 31 P.3d 105, 110 (Alaska App. 2001) (noting that a party's failure to designate a record to support the party's claims justifies a reviewing court in deciding those claims against the party) (internal citations omitted).

the defendant's post-conviction relief claims.[24] Under Alaska Civil Rule 8(c), a statute of limitations defense must be pleaded as an affirmative defense.[25] Failure to do so may constitute a waiver of this defense.[26] (Federal habeas corpus law is similar: a statute of limitations defense is not jurisdictional and can be waived.[27])

In Carlson's case, the prosecutor cursorily raised the timeliness issue and argued that Carlson's post-conviction relief application should be rejected as time-barred. But the prosecutor otherwise accepted all of the factual assertions contained in Carlson's motion, and she never challenged the legal framework that Carlson put forward to explain the tardiness of the application. The prosecutor also failed to challenge or seek clarification of the aspects of the court's ruling that the State now challenges on appeal.

Given the cursory manner in which the statute of limitations issue was litigated by the State in the superior court, and given the reasonable inferences to be drawn from the uncontested facts alleged by Carlson in his pleadings, we conclude that the superior court did not err when it granted Carlson's motion to accept his application as timely and to proceed to litigation of his claims on their merits.

In reaching this conclusion, we make two additional points.

---

[24]  *See Holden v. State*, 172 P.3d 815, 818 (Alaska App. 2007); *Alex*, 210 P.3d at 1229.

[25]  Alaska Rule of Civil Procedure 8(c) is applicable to post-conviction relief litigation. *See* Alaska Criminal Rule 35.1(g).  Under Civil Rule 8(c), a defendant must "set forth affirmatively" its affirmative defenses.

[26]  *See Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 295 (Alaska 1976); *cf. Barrett v. Byrnes*, 556 P.2d 1254, 1254-55 (Alaska 1976) (failure to file responsive pleadings can result in waiver of statute of limitations defense).

[27]  *See Day v. McDonough*, 547 U.S. 198, 208-10 (2006).

First, we agree with the State that Alaska law is unsettled with regard to the question of whether an appellate attorney has a duty to inform a client of the statute of limitations governing any potential future post-conviction relief application.

In *Roe v. Flores-Ortega*, the United States Supreme Court held that a defendant's failure to meet a filing deadline for a direct appeal could be excused, based on ineffective assistance of counsel, if the defendant can show (1) that the defendant's attorney unreasonably failed to consult with the defendant about the possibility of an appeal, and (2) that, but for the defense attorney's unreasonable failure to consult with the defendant about an appeal, the defendant would have filed a timely appeal.[28]

In *Harvey v. State*,[29] we adopted the *Flores-Ortega* test to define a trial attorney's duty to consult with a client regarding the client's appellate rights.[30] But we have not held that an attorney who represents a defendant on direct appeal has a duty to consult with the defendant regarding potential post-conviction relief remedies.

---

[28]  *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000).

[29]  *Harvey v. State*, 285 P.3d 295, 305 (Alaska App. 2012).

[30]  *See Harvey*, 285 P.3d at 305, where we held that a trial attorney acts incompetently when the attorney "fails to engage in meaningful discussions with the defendant about the possibility of an appeal in either of two situations: (1) when the defendant has given the attorney a reasonable indication that they are interested in appealing, or (2) when there are objective reasons to think that a rational person in the defendant's position might want to appeal." *See also Wassilie v. State*, 331 P.3d 1285, 1288 (Alaska App. 2014).

We have also found the *Flores-Ortega* test applicable in a situation where a trial attorney failed to file for judicial review of an administrative decision. *See Frank v. State*, 2009 WL 349791, at *2 (Alaska App. Feb. 11, 2009) (unpublished); *see also Basargin v. State*, 2006 WL 3334018, at *1-2 (Alaska App. Nov. 15, 2006) (unpublished) (suggesting that *Flores-Ortega* may be applicable in a situation where defendant hired an attorney to file an application for post-conviction relief).

In *Wassilie v. State*, we extended this duty to attorneys who represent a defendant in an application for post-conviction relief in the trial court, and who file a certificate of no merit as to the defendant's claims.[31] In *Wassilie*, we held that an attorney who files a certificate of no merit has an obligation "to ascertain [the defendant's] desires regarding a potential appeal, and to take the steps necessary to preserve [the] right of appeal if that is what [the applicant] wishes to do."[32]

On appeal, Carlson argues that this same duty should extend to attorneys who represent defendants on direct appeal and who are aware, through their review of the record on appeal and conversations with their clients, of potential ineffective assistance of counsel claims that the defendant cannot bring on direct appeal but may wish to pursue in an application for post-conviction relief. For its part, the State argues that no such duty should apply because ineffective assistance of counsel claims are normally wholly collateral to a defendant's direct appeal.[33]

We conclude that we need not reach the question of what duty, if any, appellate attorneys owe their clients with regard to ineffective assistance of counsel claims or other post-conviction relief remedies. We reach this conclusion because we do not read the superior court's ruling as broadly as the State does.

The State asserts that Judge Smith's ruling "rests on the assumption that counsel on direct appeal has an affirmative duty to expressly inform an unsuccessful

---

[31]  *Wassilie*, 331 P.3d at 1288.

[32]  *Id.*; *see also* Alaska R. Prof. Conduct 1.2(a) & 1.16.

[33]  The State also argues that there is nothing in the record to suggest that Carlson ever asked Malin about raising ineffective assistance of counsel claims against Dayan. The State is correct that the record is silent on this issue, and that this issue was never litigated in the superior court. But Malin presumably would have been aware of Carlson's pro se motion alleging that Dayan was ineffective. This motion was filed prior to Carlson's sentencing, and it was therefore part of the record on appeal.

appellant of the deadline to file a post-conviction application." We do not read the court's ruling this way. Instead, we view the court's ruling as grounded in the specific circumstances presented here — circumstances that involved a highly unusual turn of events where a state appellate attorney essentially handed off his client to a pro bono out-of-state attorney who was unfamiliar with Alaska's post-conviction relief procedures (and apparently also unfamiliar with the "exhaustion of state remedies" requirement for federal habeas relief). We also note that, unlike the cases cited by the State in its brief, Carlson remained represented by the same out-of-state attorney even after his direct appeal was over.[34] Thus, unlike the defendants in the other cases, Carlson potentially had good reason to believe that his post-conviction relief rights were being safeguarded by his attorney during this representation.[35]

In sum, we view the superior court's ruling on the timeliness of Carlson's post-conviction relief application as limited to the unusual circumstances presented by Carlson's case. We also conclude that our review of that ruling should be limited to the issues actually raised and litigated in the superior court. Given the State's failure to

_____

[34]    *See Miranda v. Castro*, 292 F.3d 1063, 1067-68 (9th Cir. 2002) (appellate attorney misadvised client of deadline for habeas petition in letter ending her representation of him); *Summers v. Patrick*, 535 F. Supp. 2d 995, 999 (C.D. Cal. 2008) (defendant failed to comply with statutory time limits due to "not having [an] attorney"); *Noyakuk v. State*, 2011 WL 3249583 (Alaska App. July 27, 2011) (unpublished) (defendant petitioned for habeas one year after his appellate attorney had ended his representation); *People v. Alexander*, 129 P.3d 1051, 1056 (Colo. App. 2005) (stating that "lack of legal assistance does not excuse the late filing of a [post-conviction relief] motion"); *Bartz v. State*, 839 P.2d 217, 226-27 (Or. 1992) (defendant untimely filed for post-conviction relief after having declined direct appeal, so had no appellate attorney).

[35]    *See Alex*, 210 P.3d at 1228 (suggesting that when a person is represented, they may reasonably rely on their attorney to take care of legal decisions and may have an argument for equitable tolling when deadlines are missed).

preserve the various challenges it now raises on appeal, we reject the State's argument that Carlson's post-conviction relief application should be dismissed as time-barred.

### B. The superior court's *Arnett* ruling

In *Arnett v. State*, we held that a defendant who voluntarily commits a crime on the advice of counsel cannot later claim that the attorney's advice amounted to ineffective assistance of counsel — because, "in almost all such cases, the defendant's own voluntary acts will be a superseding cause of any resulting misfortune."[36]

The State argues that our decision in *Arnett* bars Carlson from raising ineffective assistance of counsel claims against Dayan as a matter of law. Specifically, the State argues that Carlson should be estopped from claiming that Dayan provided ineffective assistance of counsel because it was Carlson's own conduct — repeatedly lying to the police and potentially perjuring himself at trial — that gave rise to Dayan's alleged ineffective assistance of counsel.

We are not persuaded by this argument. The rule in *Arnett* is limited to circumstances where an attorney and a defendant act in collusion.[37] It would be counter

---

[36] *Arnett v. State*, 938 P.2d 1079, 1083 (Alaska App. 1997). As we explained in *Arnett*:

> We have no doubt that a lawyer who counsels a client to commit a crime for tactical gain acts incompetently. But by the same token, this form of advice falls so far beyond the pale of anything that could conceivably be considered legitimate legal assistance that a defendant's voluntary reliance on it is tantamount to a willing abandonment of competent representation.

*Id.*; *see also Harding v. Lewis*, 834 F.2d 853, 858-59 (9th Cir. 1987) (rejecting ineffective assistance of counsel claim based on involuntary self-representation when defendant, in an attempt to inject reversible error into the trial through self-representation, conspired with counsel to invent an excuse for discharging counsel in the midst of trial).

[37] *See, e.g.*, *Prentzel v. State*, 2009 WL 1361959, at *2-3 & n.3 (Alaska App. May 13,
(continued...)

to public policy to apply this rule to defendants who, on their own initiative, provide a version of events at trial that contradicts what they earlier told the police. Such a rule would effectively prevent defendants who claim they were pressured to falsely confess from challenging the effectiveness of their attorneys' litigation of this issue.

Here, Carlson's ineffective assistance of counsel claims against Dayan rest primarily on Carlson's assertion that any competent attorney would have moved to withdraw once Carlson made it clear that he intended to testify at trial and repudiate the November 10 confession that Dayan had helped facilitate and had previously promoted as the truth. Carlson does not claim that Dayan advised him to give a false confession to the police. Nor has Carlson claimed that Dayan advised him to perjure himself at trial.

Accordingly, we affirm the superior court's rejection of the State's *Arnett* argument, and we conclude that Carlson was not barred as a matter of law from raising his claims of ineffective assistance of counsel against Dayan.

## C. *The superior court's conflict analysis*

The superior court found that Carlson had proved, by clear and convincing evidence, that Dayan was laboring under an "actual conflict of interest" based on Dayan's personal involvement in the later-repudiated November 10 confession. The superior court further found that this "conflict of interest" gave rise to a non-rebuttable presumption of prejudice — a presumption that required the court to reverse Carlson's

---

[37] (...continued)
2009) (unpublished) (defendant barred from claiming ineffectiveness under *Arnett* where attorney advised defendant not to file an appeal in hopes that the superior court would forget that the defendant had been released on bail pending appeal); *Nelson v. State*, 2007 WL 1098411, at *7 (Alaska App. Apr. 11, 2007) (unpublished) (explaining that *Arnett* stands for the proposition that a "defendant's complicity in [his trial attorney's] illegal act disqualified the defendant from obtaining post-conviction relief").

convictions from his second trial, even if Carlson could not show that there was at least a reasonable possibility that the outcome of his trial would have been different if someone other than Dayan had been his attorney.

On appeal, the State argues that the superior court's conflict analysis is legally flawed. We agree with the State that the superior court's conflict analysis is flawed, although we do not completely agree with the State's analysis of the relevant law. We therefore provide a brief history and overview of the applicable law in order to ground our explanation of the errors in the superior court's reasoning and ultimate findings.

### 1. Brief overview of the law on post-conviction conflict of interest claims

A defendant's right to effective assistance of counsel under the Sixth Amendment has two components: competent representation, and zealous, conflict-free representation.[38] Because the right to conflict-free counsel is a subset of the right to effective assistance of counsel, a defendant who seeks post-conviction relief based on a claim that his attorney was laboring under a conflict of interest would typically need to prove both prongs of an ineffective assistance of counsel claim — including the prejudice prong.[39]

---

[38] *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

[39] *See Newby v. State*, 967 P.2d 1008, 1011-12 (Alaska App. 1998) (describing a conflict claim as a subset of an ineffective assistance of counsel claim); *see also Strickland v. Washington*, 466 U.S. 668, 692 (1984) (setting forth the two-prong test for ineffective assistance of counsel under the federal constitution); *Risher v. State,* 523 P.2d 421, 425 (Alaska 1974) (setting forth the two-prong test for ineffective assistance of counsel under the Alaska constitution and requiring only a "reasonable possibility" of a different outcome rather than the "reasonable probability" standard required under federal law).

In 1980, however, the United States Supreme Court held in *Cuyler v. Sullivan* that a defendant who could prove that his attorney was laboring under "an actual conflict of interest [that] adversely affected his [attorney's] performance" would not have the additional burden of proving the traditional prejudice prong of an ineffective assistance of counsel claim.[40] That is, the defendant would be relieved of the additional burden of showing that there was a reasonable probability that the outcome of his trial would have been different.[41]

The presumed prejudice aspect of *Cuyler* applies only to the question of whether the defendant's trial might have had a different ultimate outcome. The defendant still bears the burden of showing that the attorney's conflict of interest prejudiced him in the sense that, because of the attorney's conflicting interest, the attorney took some action (or refrained from taking some action) that was contrary to the defendant's interests.[42] As the United States Supreme Court later explained in *Strickland v. Washington*, this presumption of prejudice as to the ultimate outcome was adopted because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests."[43]

---

[40] *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

[41] *Id.*; *see Strickland*, 466 U.S. at 694.

[42] *See generally* 3 Wayne R. LaFave *et al.*, *Criminal Procedure* § 11.9(d), at 1074 (4th ed. 2015) (explaining the *Cuyler* decision and its rationale).

[43] *Strickland*, 466 U.S. at 692. Professor LaFave explains the Court's reasoning as follows:

> Once it is shown that counsel was adversely influenced by the conflict in one aspect of his performance, it would be inappropriate to measure the impact of that conflict solely by reference to that action or inaction. A court could not assume that counsel so motivated had not also been

(continued...)

The *Cuyler* standard is therefore different from the rule of per se reversal that applies to situations where a defendant is deprived of counsel altogether.[44]  Instead, under *Cuyler*, prejudice is presumed only if the defendant demonstrates that (1) the attorney was placed in a situation where conflicting loyalties pointed in opposite directions (an "actual conflict"), and that, because of the conflicting loyalties, (2) the attorney acted against the defendant's interests (*i.e.*, the conflict of interests "adversely affected his performance").[45]

In the years since *Cuyler* was decided, disagreement has arisen in the federal courts regarding whether the *Cuyler* standard applies to all alleged conflicts of interest or only to the types of conflicts that were primarily at issue in *Cuyler* — *i.e.*, conflicts of interest arising from the attorney's concurrent or joint representation of co-defendants.  As a result of this disagreement, some federal circuit courts have refused to apply the *Cuyler* rule of presumed prejudice to conflict of interest claims that do not

---

[43]  (...continued)
> influenced by the conflict in various other aspects of his representation.
> It was at this point that an assessment of prejudice became too speculative.

3 Wayne R. LaFave *et al.*, *Criminal Procedure* § 11.9(d), at 1074 (4th ed. 2015).

[44]  *See Strickland*, 466 U.S. at 692; *see also LaPierre v. State*, 734 P.2d 997, 1003-04 (Alaska App. 1987) (rejecting defendant's argument that "reversal automatically follows upon a bare showing of conflict of interest").

[45]  *Cuyler*, 446 U.S. at 350; 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.9(d), at 1074 (4th ed. 2015).

involve joint representation,[46] while other federal circuits have applied the *Cuyler* standard to a broader range of conflicts of interest.[47]

The Alaska courts follow a slightly different conflict analysis than the federal courts. In cases involving "egregious" conflicts of interest such as the joint representation of co-defendants presented in *Cuyler*, the Alaska courts apply a standard that was formulated by the Alaska Supreme Court in its pre-*Cuyler* 1978 decision *Moreau v. State*.[48]

Under the *Moreau* standard, the trial court is required to affirmatively advise co-defendants who are jointly represented by the same attorney of the dangers

---

[46] *See, e.g.*, *Beets v. Scott*, 65 F.3d 1258, 1268-73 (5th Cir. 1995) (en banc) (rejecting extension of *Cuyler* to breaches of loyalty pitted against an attorney's self-interest, and instead analyzing such claims under the *Strickland* test).

[47] *See*, *e.g.*, *Summerlin v. Stewart*, 267 F.3d 926, 935-41 (9th Cir. 2001) (analyzing romantic "entanglement" with the prosecutor under the *Cuyler* standard); *Freund v. Butterworth*, 165 F.3d 839, 858-60 (11th Cir. 1999) (analyzing obligation to a former client under *Cuyler* standard); *Garcia v. Bunnell*, 33 F.3d 1193, 1194-95, 1198, n.4 (9th Cir. 1994) (holding that under *Cuyler* defendant must demonstrate why his attorney's future employment with the prosecution posed an actual conflict of interest); *United States v. Young*, 644 F.2d 1008, 1013 (4th Cir. 1981) (applying *Cuyler* to successive representation of co-defendants); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980) (holding that attorney's book contract justified a hearing and application of *Cuyler* to the defendant's claim of conflict of interest). Although the United States Supreme Court has not directly answered the question of how broadly *Cuyler* was intended to apply, dicta in *Mickens v. Taylor*, a 2002 decision, suggests that the *Cuyler* standard may not have been intended to apply as broadly as some federal courts have assumed. *See Mickens v. Taylor*, 535 U.S. 162, 175-76 (2002) (explaining in dicta that it was an open question under the Court's jurisprudence whether *Cuyler* would apply beyond the concurrent representation context, or whether the prejudice requirement from *Strickland* would be necessary, and noting that "not all attorney conflicts present comparable difficulties").

[48] *Moreau v. State*, 588 P.2d 275, 283-84 (Alaska 1978).

inherent in such a joint representation.[49]  If the trial judge fails to conduct this inquiry, and a defendant subsequently raises a post-conviction claim based on the joint representation, the burden then shifts to the State to prove beyond a reasonable doubt that the joint representation had no adverse effect on the outcome of the defendant's trial.[50]

In all other conflict of interest claims, the Alaska courts apply the *Cuyler* standard — oftentimes referred to as the *LaPierre* standard because of this Court's decision in *LaPierre v. State.*[51]  The Alaska courts have applied this standard to a wide variety of conflict of interest claims.[52]  A "conflict in the abstract," or the mere possibility of a conflict of interest, is insufficient to meet this standard.[53]

---

[49]  *Id.*

[50]  *Id.*; *State v. Celikoski*, 866 P.2d 139, 141-42 (Alaska App. 1994).

[51]  *LaPierre v. State*, 734 P.2d 997, 1003-04 (Alaska App. 1987); *Cuyler*, 446 U.S. at 345-50.  We note that the superior court relies heavily on an earlier case, *Wilson v. State*, 711 P.2d 547 (Alaska App. 1985).  However, *Wilson* does not lay out the *Cuyler* standard as clearly as it could, referring in short hand to the requirement that the defendant show an "actual conflict of interest that adversely affected the attorney's performance" simply as a requirement that the defendant show "an actual conflict of interest."  *Id.* at 549.

[52]  *See, e.g.*, *White v. State*, 773 P.2d 211, 216 (Alaska App. 1989) (applying *Cuyler* to professional conflict of interest); *Mitchell v. State*, 2015 WL 7201167, at *2 (Alaska App. Nov. 12, 2015) (unpublished) (defendant alleged conflict of interest based on attorney's mother's relationship to victim); *McDonald v. State*, 2015 WL 1881591, at *5 (Alaska App. Apr. 22, 2015) (unpublished) (defendant alleged conflict of interest when public defender agency separately represented two clients involving the same confidential informant); *Lane v. State*, 1994 WL 16196204, at *3-5 (Alaska App. Mar. 23, 1994) (unpublished) (defendant alleged conflict based on attorney's prior guardian ad litem representation of a witness).

[53]  *LaPierre*, 734 P.2d at 1003-04.

*2. Application of these principles to the present case*

In order for Carlson to prevail in his claim for post-conviction relief based on Dayan's alleged conflict of interest, Carlson was required to prove by clear and convincing evidence that (1) Dayan had a loyalty to someone else or, alternatively, some personal interest, that conflicted with Dayan's loyalty to Carlson, and (2) this loyalty to someone else (or to his own self-interest) actually affected Dayan's preparation or presentation of Carlson's case in a manner that was adverse to Carlson's interests.[54]

The superior court failed to use this standard when it assessed Carlson's conflict of interest claim. Instead, the superior court appeared to rely on a colloquial understanding of the term "conflict." The court found that there was "conflict" between Dayan's role as the participant in the videotaped confession and Dayan's role as Carlson's advocate at trial. But the superior court never explained how this purported "conflict" between Dayan's roles translated into actively conflicting *loyalties* in the sense intended by *LaPierre* and *Cuyler*.

Notably, there is nothing in the record currently before us to suggest that Dayan was laboring under an actual conflict of interest in the sense of being motivated by loyalty to any person other than Carlson.[55] Nor is there any basis for concluding that Dayan was working against Carlson's interests to protect his own professional self interest. For example, the record does not suggest that Dayan failed to withdraw because he was concerned that another attorney would attack his professional competence at trial or argue that Dayan coerced Carlson into giving a false confession to the police. To the

---

[54]  *See Newby*, 967 P.2d at 1014.

[55]  We acknowledge that Carlson's amended application alleges various conflicts of interest related to Dayan's interactions with the police and with a potential witness. But these claims were not litigated at the evidentiary hearing, and Dayan was not asked to respond to them at that hearing.

contrary, Dayan's testimony at the evidentiary hearing made clear that he did not believe he had done anything wrong when he advised Carlson to participate in the videotaped police interview on November 10. Dayan likewise testified that he believed it was "nonsense" to claim that he coerced Carlson into giving this confession. Dayan was also adamant that there were many defense attorneys who would agree that having Carlson "come clean" to the police was a reasonable tactical decision, given the circumstances known to Dayan at the time.

As we explain in the next section, it may well have been incompetent for Dayan to fail to recognize the "conflict" or tension between (1) his earlier stance that the accidental shooting version of events was the truth and (2) his role as Carlson's trial advocate arguing for the truth of the "B" version of events. But even if Dayan acted incompetently when he continued to represent Carlson under these circumstances, this does not mean that Dayan had a conflict of interest within the meaning of our case law.

Accordingly, we conclude that the superior court erred when it found that Carlson had proved that Dayan was laboring under "an actual conflict of interest" that gave rise to a "non-rebuttable" presumption of prejudice that required reversal of Carlson's convictions.

### D. The superior court's finding that Dayan violated the advocate-witness rule

The State also challenges the superior court's finding that Dayan violated Alaska Rule of Professional Conduct 3.7(a) by representing Carlson at trial. Alaska Professional Conduct Rule 3.7(a) provides that a lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a "necessary witness" unless the lawyer's testimony relates to an uncontested issue, or is limited to "the nature and value of legal

– 39 – 2641

services rendered in the case," or unless the lawyer's disqualification "would work substantial hardship on the client."

As the commentary to Rule 3.7(a) states, "[c]ombining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client."[56] The conflict of interest typically identified in these circumstances is the conflict that might exist between the attorney's obligation to testify truthfully and the attorney's duty of loyalty to the client, in cases where the client's position might be weakened by the attorney's truthful testimony.[57]

### 1. Was Dayan a "necessary" witness for the defense?

Concerns about a potential violation of the advocate-witness rule typically arise when the attorney has material personal knowledge of the underlying events being litigated, and the attorney is therefore likely to be called as a witness at trial by one of the parties.[58] If the anticipated testimony will be adverse to the attorney's client, the attorney is generally required to withdraw.[59] If the anticipated testimony will be favorable to the client, the attorney is not necessarily required to withdraw, although the attorney is

---

[56] *See* Alaska Professional Conduct Rule 3.7(a), comment para. 1.

[57] *See id.* at comment para. 6.

[58] *See United States v. Locascio*, 6 F.3d 924, 934 (2d Cir. 1993).

[59] *See Cannon v. Stonefield*, 844 P.2d 1131, 1136 (Alaska 1993) (withdrawal is required when an attorney learns or it is obvious that the attorney may be called by the other side and the attorney testimony is or may be prejudicial to the client); *see also People v. Rodriguez*, 115 Cal. App. 3d 1018, 1021-22 (Cal. App. 1981) (reversing defendant's conviction where defense attorney was required to provide adverse testimony against defendant).

required to withdraw if the favorable testimony that the attorney has to offer is essential to his client's case, thus making the attorney a "necessary" witness for his client.[60]

In *Commonwealth v. Patterson*, for example, the Massachusetts Supreme Judicial Court held that a defense attorney who was a material witness to her client's unrecorded statements to the police acted incompetently when she failed to withdraw from the representation so that she would be available to testify on her client's behalf.[61]

Relying on *Patterson*, the superior court in Carlson's case appears to have concluded that Dayan was similarly ineffective for failing to recognize his value to Carlson as a defense witness. The court stated in its order:

> Had Dayan been a witness rather than an attorney, he could have potentially aided the defense by testifying as to the pressure on Carlson leading up to his confession, as well as his and Detective Arend's statements that a confession would be much easier for Carlson and would result in a lesser punishment.

But there is very little in the evidentiary record to support the superior court's conclusion that Dayan would have been a helpful witness for Carlson. Instead, Dayan's testimony at the evidentiary hearing suggests that he would not have had particularly favorable testimony to offer with regard to the circumstances that led Carlson to come forward with the accidental shooting version of events. Dayan testified that it was "nonsense" to claim that he had coerced Carlson into telling this version of events to the police. And Dayan's testimony about the advice he gave to Carlson regarding the

---

[60]    *See Commonwealth v. Patterson*, 739 N.E.2d 682, 692 (Mass. 2000); *Commonwealth v. Rondeau*, 392 N.E.2d 1001, 1004 (Mass. 1979) (concluding that once it "became apparent to [defense counsel] that his testimony might be necessary to the proper defense of his client, he was ethically obligated to withdraw as counsel").

[61]    *See Patterson*, 739 N.E.2d at 693-94.

consequences of admitting to accidentally shooting Featherly would have directly contradicted Carlson's trial testimony on this matter.[62]

Nor does it appear that Dayan would have given testimony to support Carlson's readoption of the "B" version of events after he was arrested. According to Dayan, even Carlson's "B" version of events kept shifting, and it remained unclear to Dayan what version of events Carlson was actually committed to until right before the first trial.

We therefore find little support in the current record for the superior court's conclusion that Dayan would have given favorable testimony for Carlson's defense had he been available to testify at trial.

*2. Was Dayan an "actual witness"?*

In its order, the superior court found that Dayan's actions and statements in the confession of November 10 were "tantamount to Dayan testifying against his client at his trial in clear violation of Alaska Rule of Professional Conduct 3.7." The superior court wrote:

> Dayan's failure to withdraw as counsel, or alternatively to seek a protective order excluding any reference to his presence at the interview of his client, meant that the trial jury knew that the lawyer seeking to establish the credibility of his client's story at trial had already told the police that the version of the story he was espousing at trial was untrue. Dayan told the jury that his client did *not* shoot Featherly,

---

[62] On cross-examination during his second trial, Carlson testified that "nobody" — including Dayan — ever warned him that he could face criminal charges if he accidentally shot Featherly. The prosecutor later argued to the jury that Carlson's testimony on this point was not believable — that it was inconceivable that Carlson's attorney would not have warned him that he might face criminal charges for an accidental shooting.

while the prosecution showed the jury a recording of Dayan actively participating in Featherly's confession and stating that he was confident that the confession was truthful.

On appeal, the State takes issue with the superior court's characterization of Dayan as an "actual witness." We agree with the State that Dayan did not become an "actual witness" at Carlson's trials. Dayan did not take the stand and provide statements under oath at either of Carlson's trials. However, we agree with the superior court that Dayan's participation as Carlson's attorney created problems akin to the "unsworn witness" problem recognized by this Court in *Kanulie v. State*.[63]

The problem of the attorney as "unsworn witness" can arise when either the defense attorney or the prosecutor in a criminal case has participated in or witnessed the events that will be explored at the trial.[64] The concern in such situations is two-fold: First, the attorney may be "constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client."[65] Second, the attorney's role "as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination."[66]

Here, there may be an argument that, because of Dayan's personal involvement in the now-repudiated confession of November 10, he was constrained from attacking that confession as aggressively as another attorney might have. But as we have

---

[63]  *Kanulie v. State*, 796 P.2d 844 (Alaska App. 1990).

[64]  *Losascio*, 6 F.3d at 933-34.

[65]  *Id.*

[66]  *Id.*

already discussed, there is little in the record to suggest that Dayan actually felt such a constraint. Moreover, as we discuss later in this opinion, the record shows that Dayan *did* attack the November 10 confession as false, and Dayan provided multiple explanations for why Carlson might have falsely confessed to accidentally shooting Featherly.

The bigger problem appears to be the inconsistency between Dayan's prior statements and actions related to the November 10 confession and his later actions and statements at trial in support of the "B" defense. In other words, unlike the typical unsworn witness case, the concern here is not that Dayan's dual role might have given his client an unfair advantage. Rather, the concern is that Dayan's dual role (as both Carlson's attorney and as a participant in the November 10 interview) would have worked to Carlson's disadvantage because Dayan's statements during (and leading up to) the November 10 interview were adverse to Carlson's trial testimony.[67]

We addressed the more traditional problem presented by an attorney acting as an "unsworn witness" in *Kanulie v. State*.[68] In the middle of Kanulie's trial, Kanulie filed a motion to preclude the State from introducing two police interviews because the trial prosecutor had personally participated in both interviews.[69] Kanulie argued that, if the interviews were played, he would want to call the prosecutor as a witness to testify to Kanulie's demeanor at the time, and to explain what was said during certain portions

---

[67] *Cf. People v. Rodriguez*, 115 Cal. App. 3d 1018, 1021, 171 Cal. Rptr. 798 (Cal. App. 1981) (noting that when a defense attorney has been placed in a position adverse to his client, all his efforts on the defendant's behalf will be suspect: "The jury can hardly avoid inferring the defendant's own attorney does not believe in the defense he himself is presenting.").

[68] *Kanulie v. State*, 796 P.2d 844 (Alaska App. 1990).

[69] *Id.* at 846.

of the interviews that were inaudible in the recording.[70]  Kanulie also argued that the interviews should be excluded because the prosecutor would be able to use his dual role as both participant and prosecutor "to argue his own credibility as a witness to events which were part of the evidence at trial."[71]  Although the trial court prohibited the prosecutor from referring to his own involvement in the recorded interviews when he argued the case to the jury, the trial court ruled that the interviews were otherwise admissible.[72]

We affirmed this ruling on appeal, concluding that Kanulie's statements in the recorded interview "essentially spoke for themselves," and also that there was no need to call the prosecutor as a witness because the trooper who participated in the interview was likewise available to testify, if needed.[73]  We also emphasized the untimeliness of Kanulie's motion — indicating that such motions must be brought before the trial begins so that there could be timely discussions regarding whether the prosecutor should be recused.[74]

Here, the State argues that Dayan's participation in the November 10 interview was analogous to the prosecutor's participation in the recorded police interviews in *Kanulie*.  According to the State, Dayan played only a limited role in the November 10 interview, and his participation involved little more than asking neutral "clarifying questions" about parts of Carlson's accidental shooting story.

---

[70]  *Id.*

[71]  *Id.*

[72]  *Id.*

[73]  *Id.* at 848.

[74]  *Kanulie*, 796 P.2d at 846-48.

We disagree with the State's characterization of this evidence. Although the State is correct that Dayan never directly asserted in the videotaped interview that he believed the accidental shooting version of events and disbelieved Carlson's "B" version of events, Dayan's behavior throughout the interview is consistent with this attitude. In the videotaped confession, Dayan can be seen actively encouraging Carlson to provide more details about the accidental shooting version of events, and Dayan readily participated in Carlson's purported reenactment of the shooting; indeed, Dayan appeared to be more enthusiastic about the reenactment than Carlson himself. And Dayan even vouched for Carlson's credibility at one point during the interview.

Moreover, the State's brief fails to acknowledge that the jury *did* hear statements from Dayan in which he indicated that he was "pretty confident" that the accidental discharge version of events was true. At Carlson's second trial, the prosecutor elicited these statements from Detective Arend (with no hearsay objection from Dayan).

We therefore agree with the superior court that Dayan's dual roles at Carlson's trials potentially created significant liabilities for the defense. We also agree with the superior court that it was not reasonable for Dayan to believe that he would be just as able as any other lawyer to represent Carlson in advocating the truth of the "B" version of events at trial, knowing that the jury would learn that he had actively facilitated and promoted what Carlson now claimed to be a false confession.[75]

---

[75] We note that the problem of Dayan as an "unsworn witness" was raised by the prosecutor in a pleading filed between the two trials. That pleading, which was filed on March 7, 2000, discussed the problem of Dayan as an "unsworn witness" if a former client of Dayan testified at trial, suggesting that the former client's testimony could require disqualification of Dayan at the second trial. In the prosecutor's discussion of the potential unsworn witness problem that would be created by this witness's testimony, the prosecutor noted that this was a problem that "already existed in this case" based on "Attorney Dayan's presence at Carlson's November 1998 video-taped confession which Attorney Dayan

(continued...)

That said, we disagree with the superior court's finding that Dayan's failure to recognize the potential liabilities of his dual roles constituted an "actual conflict of interest" for purposes of the "presumed prejudice" rule under *Cuyler* and *LaPierre.* Instead, based on the record currently before us, we conclude that these deficiencies in Dayan's representation must be analyzed under the normal two-prong *Risher* test for ineffective assistance of counsel — a test that requires the defendant to show that there is a reasonable possibility that the litigation would have ended with a different outcome.

### E. The superior court's findings on Carlson's ineffective assistance of counsel claim

Under *Risher v. State*, a defendant who claims ineffective assistance of counsel must prove two things: first, that their attorney acted incompetently (*i.e.*, that the attorney failed to meet the standard of performance minimally required of criminal law practitioners); and second, that the attorney's incompetence prejudiced the defendant in the sense that there is at least a reasonable possibility that the result at the defendant's trial would have been different but for the attorney's incompetence.[76]

In Carlson's case, the superior court found that Carlson had proved both prongs by clear and convincing evidence. On appeal, the State challenges this conclusion, arguing that it rests on clearly erroneous factual findings and incorrect legal assumptions. Although we disagree with certain aspects of the State's characterization of the record, we nevertheless agree with the State that there are sufficient questions

---

[75] (...continued)
subsequently argued was false." Carlson subsequently decided to forgo the testimony of this former client and no further discussion of the unsworn witness problem appears to have occurred.

[76] *Risher*, 523 P.2d at 424-25.

about the court's factual findings and legal reasoning to require a remand for further proceedings on the underlying ineffective assistance of counsel claim, particularly with regard to the prejudice prong of the *Risher* test.

### 1. The superior court's erroneous ruling regarding the protective order

In the superior court, Carlson argued that Dayan acted below the standard of competence when he failed either to withdraw from the representation or to seek a protective order that would have prevented the jury from learning that Dayan was the attorney who facilitated the November 10 videotaped confession. In its order, the superior court focused primarily on Dayan's failure to seek a protective order. The court found that "[such] a motion for protective order [would] have been granted," and that this motion "was the minimum required for Carlson to have received a fair trial."

We disagree with the superior court's finding that a protective order would have been granted in these circumstances. As Carlson's own expert witness, John Murtagh, acknowledged at the evidentiary hearing, Dayan's participation in the November 10 interview was an integral part of that interview, and it would be extremely difficult — if not impossible — to edit Dayan out of the videotape without substantively altering one of the prosecution's most important pieces of evidence against Carlson. Seeking a protective order might have brought additional attention to the problem that Dayan's dual roles presented, and it might have resulted in either Dayan's withdrawal or some form of knowing waiver of the problem by Carlson. But there is no reason to believe that a request for a protective order would have been granted.[77]

---

[77] *See Adams v. State*, 390 P.3d 1194, 1203-04 (Alaska App. 2017) ("[W]hen a claim of ineffective assistance of counsel is based on an attorney's failure to pursue a motion, the
(continued...)

*2. The superior court's erroneous findings regarding the first jury's awareness of the recorded confession*

As we just explained, there are two prongs to an ineffective assistance of counsel claim: incompetency, and resulting prejudice. In Carlson's case, the majority of the superior court's order addressed the incompetency prong, and very little attention was paid to the prejudice prong. The superior court devoted only a page and a half of its twenty-eight page order to its prejudice analysis. The superior court's reasons for finding prejudice ultimately rested on its erroneous findings that (1) the protective order would have been granted; and (2) "there is a possibility" that the granting of the protective order would have made a difference to the outcome of Carlson's second trial.

The superior court reached this conclusion because of a mistaken finding that the jury at Carlson's first trial "did not see or hear" Dayan's participation in the November 10 confession (and they could not reach a verdict on the murder charge), while the jurors at the second trial were informed of Dayan's participation in the November 10 confession (and they convicted Carlson).

As the State points out on appeal, the superior court is mistaken in its characterization of the difference between the two trials. The record shows that the jury at the first trial heard (and partially saw) Dayan's participation in the November 10 confession.[78] The audio recording of the November 10 interview was played for the

_____

[77] (...continued)
defendant must show (1) that the proposed motion would ultimately have been successful, (2) that any competent attorney would have pursued the proposed motion, and (3) that there is reason to believe that the ultimate outcome of the proceedings would have been different had the motion been granted.") (citing *State v. Steffensen*, 902 P.2d 340, 342 (Alaska App. 1995)).

[78] As previously explained, the prosecutor played portions of the videotape for the first jury during his opening statement. But the prosecutor failed to introduce this evidence at

(continued...)

– 49 –                                                    2641

juries at both trials, and Dayan's active participation was obvious from that recording. Thus, contrary to the superior court's assumptions, the jury at Carlson's first trial was well aware of Dayan's support for the "accidental shooting" version of events that Carlson described during the November 10 confession — and thus well aware of the potential dissonance between the position Dayan advocated in November 1998 and the position he was advocating at Carlson's trial.

In sum, even though there were differences between the two trials that are potentially relevant to an analysis of Carlson's ineffective assistance of counsel claim, the superior court was mistaken as to what those differences were.[79]

### 3. The trial court's finding that Dayan "made little to no attempt to unring the accidental discharge bell"

At the evidentiary hearing, attorney Murtagh testified that Carlson's trial would have been "completely different" if a different attorney had "develop[ed] ... Carlson's psychological mental state on the day of the [November 10] confession." In the superior court's written ruling, the court quoted Murtagh's testimony approvingly and seemingly adopted Murtagh's view that a different lawyer would have done more to attack the November 10 confession as false. According to the superior court, a

---

[78] (...continued) trial. The jury asked to review this evidence during its lengthy deliberations and were informed that the audiotape was available but the videotaped portions (which included Carlson's confession and the reenactment) were not available because they were never introduced into evidence. This error was not repeated at the second trial, where the relevant videotaped portions were admitted at trial and widely discussed by both parties during closing arguments.

[79] We note that, with the exception of Carlson's trial testimony, the first trial has not been transcribed and it is therefore not clear how the confession was argued and presented to the jury at that trial.

different lawyer would have been able to "attack[] the [November 10] statement by pointing out mistakes and [the] influence Dayan had in eliciting the statement," and by attributing that statement to "the natural progression of youth."

The superior court also contrasted what this hypothetical new attorney might have done with what Dayan did at trial — criticizing Dayan for "not utiliz[ing] any of these tools" and making "little to no attempt to unring the accidental discharge bell."

But contrary to the superior court's characterization of Dayan's trial performance, Dayan actually *did* utilize many of these tools, and he made active efforts to "unring" the accidental shooting version of events. In his summation to the jury, Dayan expressly argued that Carlson falsely confessed during the November 10 interview, and Dayan discussed the reasons why Carlson would have done that. He emphasized Carlson's youth, and he argued that Carlson was overwhelmed by the investigation and easily influenced by the adults around him — including both Detective Arend and Dayan himself.

This is not to say that these same arguments could not have been stronger if a different attorney was making them. But the difficulty we face in reviewing the superior court's prejudice analysis is that the court's analysis fails to address the considerable strength of the State's case against Carlson, and it likewise fails to address the credibility problems Carlson faced, regardless of who was representing him. This is not a case where prejudice — *i.e.*, the possibility of a different outcome at trial — is so obvious that an in-depth prejudice analysis is not required. Currently, the superior court's prejudice analysis is premised on faulty assumptions and incorrect facts. The superior court's order barely mentions the State's evidence in its analysis, and the court's order only briefly acknowledges the trial judge's finding that Carlson committed perjury at both of his trials.

2641

To be clear, we are not saying that the superior court was bound by the trial judge's finding that Carlson perjured himself at the two trials, or by the trial judge's finding that the "B" version of events was "patently false." But the superior court needed to acknowledge those findings and address them in some way — particularly given the fact that, unlike the trial judge, the superior court never heard Carlson testify. (Carlson did not take the stand during the post-conviction relief proceedings.) The superior court also needed to acknowledge the credibility difficulties that Carlson faced, regardless of who represented him at trial.

Because the superior court's order fails to provide adequate reasons for the court's finding of prejudice, we conclude that a remand for further proceedings is required.

*Conclusion*

For the reasons explained above, we AFFIRM the superior court's ruling that Carlson's application for post-conviction relief was timely. We likewise AFFIRM the superior court's ruling that Carlson's application is not prohibited by our decision in *Arnett*. However, we REVERSE the superior court's ruling on Carlson's ineffective assistance of appellate counsel claim (a ruling which Carlson concedes is erroneous), and we VACATE the superior court's rulings on Carlson's conflict of interest claim and his ineffective assistance of trial counsel claim. We REMAND this case to the superior court for further proceedings consistent with the guidance provided here.