NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RICHARD L. GREEN, | ) |
| | ) Supreme Court No. S-18062 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-20- |
| v. | ) 00568/00569/00570/00571 CI |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1938 – December 14, 2022 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Adam Gulkis, North Star Law Group, Anchorage, for Appellant. Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

After receiving reports of suspected child abuse, the Office of Children's Services (OCS) filed a petition to adjudicate four children in need of aid and requested temporary custody of the children. The superior court appointed counsel for each parent, made provisional findings that the children were in need of aid, and granted OCS

---

\* Entered under Alaska Appellate Rule 214.

temporary custody. OCS placed the children with their mother. Later that same day and allegedly at the direction of counsel in another matter, the father approached the Alaska State Troopers in an attempt to remove the children from their mother. The following day, OCS filed a petition for a Domestic Violence Protective Order (DVPO) against the father on behalf of the children. After extensive hearings, the superior court granted the long-term DVPO. The father appeals, alleging both violation of his right to counsel at the initial hearing and ineffective assistance of counsel related to the DVPO. Because the father's arguments are without merit, we affirm the order granting the long-term DVPO.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Richard Green and his wife have four children together: a daughter born in 2015, twin sons born in 2017, and a son born in 2018. The parents began divorce proceedings in 2019, and during the summer of 2020 they had a custody order providing for shared physical custody of the children. The children alternated time between each parent.

On July 15, 2020 the mother collected the children from Green in the morning and took the children directly to daycare. The children had been in Green's care for the prior two days. That day, the daycare reported suspected abuse of the youngest child to OCS. The daycare indicated the child had bruising on his "buttock and lower back" from hip to hip. OCS had visited the children at a different daycare two days earlier and had not observed any bruising or other concerns about the youngest child at that time.

On the same day as the report of harm, OCS took the child to a children's advocacy center for a medical examination. The physician, Dr. Goorchenko, provided a diagnosis of "child physical abuse, suspected." The medical report noted that the

"contusions on his back, sacrum, buttocks and left hip . . . are highly suspicious for non-accidental trauma due to location and pattern." Dr. Goorchenko was also concerned about scarring on the child's face "without any history to explain" the scars. The doctor distinguished these bruises and scars from other bruises the child had that were consistent "with normal toddler activity."

B.     Child In Need Of Aid (CINA) Petition

On September 1 OCS filed a non-emergency petition to adjudicate all the children as in need of aid and for temporary custody. The petition alleged that the children were in need of aid due to the youngest child's injuries.[1] Given Green's physical custody of the children immediately before discovery of the bruising, the limited time between the exchange and the mother dropping the children off at daycare, "the absence of reports of [the child] arriving at daycare in distress, and the results of the forensic examination . . . establishing non-accidental injury," the petition alleged "that the father is responsible for [the child's] injuries." OCS served the petition on Green during the parents' divorce proceeding, citing its concern that Green was a flight risk.

The court took up the petition on September 2, immediately following a hearing in the parents' divorce case. The parents' respective counsel in the divorce case were present, though neither acted in a representative capacity during the hearing on the CINA petition. After determining that both parents were eligible for and desired appointed counsel, the court appointed the Public Defender Agency as counsel for both parents, explaining that at least one parent would have different counsel once the conflict checks were completed. The court explained that the appointments and conflict checks would take about a week.

_____

[1]     AS 47.10.011(6), (8) (outlining factors related to substantial physical harm and mental injury).

Given the allegations stated in the petition, OCS asked the court to make provisional findings that there was probable cause to believe the children were in need of aid, that returning them to their father would be contrary to their welfare, and that OCS made reasonable efforts to prevent removal from the home by placing the children with their mother. Green objected, arguing it would be a violation of due process for the court to make such a finding without his appointed attorney present. The court made the provisional findings requested by OCS, explaining that while it was not feasible to hold a contested hearing on probable cause immediately, the court would "allow [him] an opportunity to speak with [his] appointed attorney prior to proceeding to contest."

That afternoon Green contacted the Alaska State Troopers. He told a trooper that the mother had taken the children during his custody time and showed the trooper an earlier custody order indicating shared custody with weekly transfers. The trooper asked whether Green had an attorney and what the attorney advised. Green told the trooper that his divorce attorney, Wayne Anthony Ross, instructed him to "come [to the police station] right now . . . [a]nd stop her from taking those kids." The trooper told Green that if the mother had taken the children in violation of a court order, she would have committed custodial interference. Green admitted to the trooper that OCS had filed a petition to declare the children in need of aid, but then said that "[w]e argued in court for about an hour and the judge denied their motion." After contacting the mother and OCS and determining OCS had placed the children in the mother's care, the troopers did not remove the children from her.

C. **Petition For Domestic Violence Protective Order**

The following day, September 3, OCS sought both a 20-day ex parte DVPO

and a long-term DVPO against Green on behalf of all four children.[2] The petition referred to the injuries to the youngest child and asserted that Green "attempted custodial interference in the 2nd degree as described in AS 11.41.330."[3] The court granted the 20-day ex parte DVPO and later determined that each side would be allotted one trial day to address both the long-term DVPO and whether, in the CINA case, there was probable cause to find that the children were in need of aid.

On September 14 the court issued an order appointing the public defender as Green's counsel in the DVPO proceedings, removing the restriction that the representation was for CINA matters only. The same day, the court stressed that Green's divorce attorney, Ross, was "not counsel of record" in the CINA or DVPO cases, although Ross was present for some of the proceedings in the event he may represent Green in those matters in the future. In November, after Ross filed a limited entry of appearance and attempted to file pleadings in the CINA and DVPO cases, the court heard from Green, Ross, and the public defender concerning Green's representation in the various cases. The court ruled that Ross could not enter a limited entry of appearance "[b]ecause Mr. Green does have representation[,]" namely, a public defender.

The court began to hear evidence in December. To support its allegations of Green's assault on the youngest child and his attempted custodial interference, OCS presented testimony from OCS caseworkers, medical experts, and the trooper Green spoke to on September 2. Green testified on his own behalf and called his own medical expert in response to OCS's experts.

---

[2]     *See* AS 18.66.100-.110 (detailing procedures and requirements for obtaining protective orders).

[3]     *See* AS 18.66.990(3)(A) (defining "crime involving domestic violence" to include "a crime against the person under AS 11.41," a chapter which includes custodial interference).

OCS called the initial caseworker for the family, who testified that there had been 18 prior protective service reports concerning the children. She testified that on July 15 she received a report from the children's daycare of suspected abuse. The children had been in Green's care for the previous two days, and the mother had collected them from Green that morning and brought them directly to daycare. The caseworker testified that she had visited the children two days prior with another OCS caseworker, and at that time "there were no injuries, no bruising, no discomfort, [and] nothing observed during diaper changing" by either caseworker.

Green also testified regarding these events. During his testimony, he admitted that he spanked the "older children" for "character issue[s]" such as lying, biting, or stealing but asserted he would not do this to a one- or two-year-old child. Despite this testimony, Green stated that he had "never hit any of [his] children." He testified that he "knew [he] was being set up" by OCS and the mother, and because of this suspicion he took photographs of the children "to be able to document that there weren't any problems with the children in [his] care." He testified that he had not seen any injuries to the youngest child before transferring the children to their mother the morning of the report. He alleged that the daycare's abuse report had been tampered with, possibly as retaliation for him reporting a daycare worker for an alleged assault against him and the child.

OCS called Dr. Goorchenko to testify about her forensic examination of the youngest child. Dr. Goorchenko testified that she "noted bruising or contusions on [the child's] back, his sacrum or lower back, his buttocks, and his left hip which were highly suspicious for nonaccidental trauma. He also had some other contusions on his forehead . . . and some scars on his face that were new without any history." She indicated that she was "very concerned" about the "extent of the bruising" and "felt it was . . . highly concerning for nonaccidental trauma or physical abuse." She further

testified that "when there is extensive or any bruising on the buttocks or the lower back, it's simply not an injury that's occurring during normal play for a child of his age." Her final diagnosis was "child abuse, suspected, initial encounter." Dr. Goorchenko examined the child again the day before her testimony and noted that "he had no bruising whatsoever on his buttocks or his lower back."

Dr. Cathy Baldwin-Johnson, medical director of the children's advocacy center the child was seen at, also testified as an expert witness for OCS in the field of pediatric medicine, including medical evaluation of suspected child abuse and neglect. She explained that she reviewed Dr. Goorchenko's report as part of the center's peer review process. Dr. Baldwin-Johnson agreed with Dr. Goorchenko's assessment and stated that a fall onto a toy could not "explain the bruising on so many different planes across [the child's] buttocks." She indicated that the photographs showed some yellowish bruising and explained that yellow bruises indicate a stage of bruising that is at least 18 hours old.

In response to these medical experts, Green called Dr. Carol Klamser, who holds a doctorate in nursing in the area of forensics, as an expert witness in forensic nursing and forensic examination. Prior to testifying she had reviewed records and photographs of the youngest child from the center and from Green. She provided alternative explanations for the bruising to the child, indicating that the bruising "[a]long the right inner aspect of the buttocks" could have been caused by a fall onto an object and "would be somewhat difficult to intentionally inflict due to the location." She indicated that other discoloration may be dermititis, hyperpigmentation, or a "Mongolian spot." Dr. Klamser testified that "a diagnosis of intentional injury cannot be made with certainty." On cross-examination, OCS asked Dr. Klamser about her familiarity with a

clinical tool that Dr. Baldwin-Johnson described as "widely used and accepted in the field of child abuse medicine." Dr. Klamser was not familiar with the tool and explained that she had only visually assessed the photographs.

OCS also called the trooper who had spoken with Green when Green sought to gain custody of the children after the September 2 hearing. OCS played the recording of the conversation between the trooper and Green into the record. The trooper confirmed that Green came to the station and told him that the mother had taken the children during Green's custody time. The trooper testified that other troopers then discovered the court order from earlier that day awarding custody to OCS and determined that the children were properly in their mother's care. An OCS caseworker confirmed this conversation, stating that she "let the trooper know that we had been in court that morning and that . . . the children had been placed with the mother through a CINA proceeding . . . . And [she] indicated that . . . [Green] had been on the phone for the hearing."

On March 9, 2021 the court issued an order committing the children to OCS's temporary custody in the CINA case, and granting the long-term DVPO. The court found placement with Green to be contrary to the children's welfare and issued the long-term DVPO to protect the children from Green, finding "by a preponderance of evidence that [Green] committed an act of domestic violence against [the youngest child] on or about July 15, 2020 when he physically assaulted the toddler." It also found that Green "made a false report to the Alaska State Troopers in an attempt to take custody of the children, knowing that the Department had legal custody," citing AS 11.41.330.[4] The

---

[4]    AS 11.41.330(a)(1) explains that "[a] person commits the crime of custodial interference in the second degree if . . . knowing that the person has no legal right to do so, the person takes, entices, or keeps that child . . . from a lawful custodian with intent
(continued...)

court held that Green "represents a credible threat to the physical safety of the children" and that a long-term DVPO "is necessary to further protect the children from harm." The subsequent DVPO allowed for contact between Green and the children "through OCS only" including "OCS arranged visitation."

Green appeals the long-term DVPO.

## III. STANDARD OF REVIEW

"Whether [a] due process right, such as the right to effective assistance of counsel, has been violated is a question of law,"[5] "as is the question whether the superior court's findings meet the requirements of the applicable child-in-need-of-aid statutes and rules."[6] This court reviews "questions of law de novo, and will adopt 'the rule of law that is most persuasive in light of precedent, reason, and policy'."[7] We review factual findings for clear error, finding "clear error only when our review of the entire record leaves us with 'a definite and firm conviction that the superior court has made a mistake.' "[8]

---

[4]     (...continued)
to hold the child . . . for a protracted period."

[5]     *S.B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 61 P.3d 6, 10 (Alaska 2002).

[6]     *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005).

[7]     *Id.*.

[8]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 901 (Alaska 2003) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

## IV. DISCUSSION

### A. Any Potential Due Process Violation At The Initial Hearing Does Not Invalidate The DVPO.

Green argues that his lack of counsel at the first CINA hearing constituted a due process violation that requires reversal of the DVPO. Green provides no authority for this proposition except a strained analogy to the "fruit of the poisonous tree doctrine." But that doctrine stems from specific concerns related to criminal law, and Green has presented no credible argument about how or why the doctrine should apply in this context.[9]

Even if we assume that there was a due process violation in the initial CINA hearing (and we express no opinion on that point), subsequent CINA hearings cured any error. Green argues that because the provisional temporary custody order violated due process, OCS had no lawful custody of the children, so it could not obtain a DVPO on their behalf. In *D.E.D. v. State* we explained that "even if the procedural and jurisdictional defects . . . existed in the earlier temporary custody hearings, they were cured by the subsequent procedurally correct final disposition hearing."[10] After Green's attorney was appointed at the temporary custody hearing, the court held a subsequent

---

[9] *See State v. Sears*, 553 P.2d 907, 911-12 (Alaska 1976) (explaining that the exclusionary rule in criminal proceedings aims to deter unconstitutional actions by law enforcement and to protect the judiciary from participating in "lawless invasions of the constitutional rights of citizens"); *see also M.G. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, No. S-10099, 2003 WL 1590818, at *4 (Alaska Mar. 26, 2003) (holding that Alaska Criminal Rule 37, which provides for the exclusion of evidence improperly obtained, does not apply to civil proceedings).

[10] 704 P.2d 774, 782 (Alaska 1985); *see also In re Hospitalization of Meredith B.*, 462 P.3d 522, 529 (Alaska 2020) (noting that "errors in a probable cause hearing are generally cured by an error-free trial on a petition to adjudicate a child in need of aid.").

hearing, where Green's attorney requested a continuance. The court granted that continuance and subsequently held hearings over the course of six months to determine whether there was probable cause to find the children in need of aid and to decide whether to grant OCS's request for a long-term DVPO. Green was represented by counsel throughout those substantive proceedings and does not raise due process concerns regarding those hearings. Consistent with our precedent, even if the court erred in making provisional findings during the initial temporary custody hearing, the subsequent procedurally correct proceedings would have cured that error. And because any defect in OCS's custody of the children was cured by the time the court issued the long-term protective order, Green's argument that OCS lacked authority to obtain a DVPO on the children's behalf fails.

**B.      Green's Ineffective Assistance Of Counsel Claim Fails.**

Green argues that his divorce attorney Ross instructed him to go to the Alaska State Troopers to pursue custody of the children, and that this instruction constituted ineffective assistance of counsel in the context of the DVPO proceedings. This claim fails for two reasons. First, Ross was not Green's attorney in the DVPO matter. The court appointed the public defender to represent Green in the DVPO matter, and Green alleges no ineffective assistance by the public defender. And second, the ineffective assistance Green alleges occurred on September 2, 2020, before the DVPO petition was filed on September 3, 2020, and thus before any right to counsel attached in the DVPO proceeding.

Whenever there is a right to appointed counsel, there is also a right to effective assistance of counsel.[11] Once a party has demonstrated the right exists, we

---

[11]      *See V.F. v. State*, 666 P.2d 42, 45 (Alaska 1983) ("[W]henever the right to counsel is constitutionally guaranteed in a particular proceeding, the effective assistance (continued...)

-11-                                                    *1938*

review the party's claim pursuant to the standard articulated in *Risher v. State*.[12] The party must demonstrate that counsel did not perform "as well as a lawyer with ordinary training and skill" in the specific area of law and that "the conduct of counsel . . . contributed to" the adverse outcome.[13] But to succeed on a claim of ineffective assistance of counsel, a party must generally show that the attorney represented the defendant in the proceeding at issue. We agree with federal circuit courts addressing this issue that "[t]o prove ineffective assistance of counsel, a party must first demonstrate that an attorney-client relationship existed."[14] In *Alyssa B. v. State, Department of Health & Social Services, Division of Family & Youth Services*, we explained that advisory counsel differs significantly from counsel who represents a party at trial.[15] Given the functional difference between counsel and advisory counsel, self-represented "defendants ordinarily may not raise claims of ineffective assistance against advisory counsel" unless "the

---

[11]    (...continued)
of counsel is also constitutionally required."). We express no opinion on whether the appointment of counsel for Green in the DVPO proceeding was constitutionally required in light of the related CINA case or whether, in general, such an appointment would be required in a DVPO proceeding filed on behalf of children against a parent.

[12]    523 P.2d 421 (Alaska 1974).

[13]    *Id.* at 424; *see also David S. v. State, Dep't of Health & Soc. Servs., Off. of Child. Servs.*, 270 P.3d 767, 784-85 (Alaska 2012) (explaining application to termination of parental rights).

[14]    *Bajoa v. U.S. Dep't of Immigr. & Naturalization*, No. 86-7688, 855 F.2d 860 (Table), 1988 WL 82814 at *2 (9th Cir. 1988); *see also Rojas-Lopez v. Holder*, 492 F. App'x 772, 773 (9th Cir. 2012).

[15]    165 P.3d 605, 613 (Alaska 2007); *see also S.B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 61 P.3d 6, 15 (Alaska 2002) ("recogniz[ing] the general rule that *pro se* defendants may not raise ineffective assistance claims against advisory counsel").

advisory counsel oversteps [a] limited role and assumes a degree of control consistent with legal representation."[16]

Ross was not Green's attorney in either the underlying CINA proceeding or the DVPO proceeding. To the extent Green had a right to counsel, the court appointed the public defender, and Green alleges no defect in the public defender's handling of the case. Further, Green's representation by the public defender in the DVPO matter underscores his inability to raise an ineffective assistance claim against advisory counsel, to the extent that Ross could even be characterized as advisory counsel. Green's ineffective assistance claim thus fails.

Additionally, any right by Green to counsel in the DVPO matter would not yet have attached on September 2, 2020, when he claims he received ineffective assistance, because the DVPO petition had not yet been filed. Even assuming Green had a right to counsel during the DVPO proceeding, the right to counsel must have attached before an ineffective assistance of counsel argument can be made.[17] The right to counsel "provided by the Sixth Amendment attaches only after formal charges have been filed."[18] We have extended the application of that right "to protect the accused during proceedings that are investigatory in nature and which are conducted in an adversar[ial] context."[19] We have never concluded that the right to counsel attaches prior to the

---

[16]  *Alyssa B.*, 165 P.3d at 613.

[17]  *See, e.g.*, *State v. Carlson*, 440 P.3d 364, 376, 376 n.16 (Alaska App. 2019); *United States v. Harrison*, 213 F.3d 1206, 1209-10 (9th Cir. 2000).

[18]  *Loveless v. State*, 592 P.2d 1206, 1210 (Alaska 1979).

[19]  *Id.*

commission of an offense. Green simply cannot make a successful ineffective assistance of counsel claim in the DVPO matter stemming from Ross's advice prior to the DVPO petition even being filed.

Finally, Green fails to demonstrate that any ineffective assistance caused him prejudice regarding the DVPO filed on behalf of his youngest child. The DVPO discussed Green's attempted custodial interference, but it also relied on a finding that Green "physically assaulted [his] toddler." This factual finding is sufficient on its own to support a DVPO.[20] Even if Green had a cognizable claim of ineffective assistance of counsel related to Ross's comments, Green would be unable to demonstrate that Ross's conduct adversely impacted the outcome of the DVPO proceeding given the court's independently sufficient factual finding.

C. The Superior Court Did Not Clearly Err By Finding That Green Knew That He Had No Right To Take The Children.

Green's ineffective assistance of counsel claim may also be interpreted as invoking the advice-of-counsel defense. The advice-of-counsel defense provides "that by seeking and following a lawyer's advice, the defendant could not have had the wrongful intent . . . required" or "could not have lacked good faith in the conduct that has allegedly given rise to liability."[21] One element of the crime of custodial interference is that the person, "knowing that [he] has no legal right to do so," takes the children from their lawful custodian.[22] The advice-of-counsel defense, if applicable, could negate this

---

[20] *See* AS 18.66.100.

[21] *Advice-of-Counsel Defense*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[22] AS 11.41.330(a)(1). This crime or an attempt to commit this crime is a basis for a DVPO. AS 18.66.100(a) (outlining bases for DVPO); AS 18.66.990(3)(A) (defining crime involving domestic violence as a crime or attempt to commit a crime (continued...)

knowing mental state.[23] In *Hartland v. Hartland*, however, we emphasized that this defense is not available when a party violates a court order, as occurred here.[24] But even if the defense were available in this case, "it is the role of the trial court to make credibility determinations and weigh conflicting evidence."[25] We will not overturn a superior court's factual finding based on conflicting evidence; nor will we "re-weigh evidence when the record provides clear support for the [superior] court's ruling."[26]

Green seems to assert that Ross advised him to commit custodial interference, that he was ignorant of the unlawfulness of his conduct, and that he thus lacked the mental state required to attempt or commit custodial interference. But [after hearing multiple days of evidentiary proceedings, including testimony from Green himself,] the superior court made a factual finding that Green "made a false report to the Alaska State Troopers in an attempt to take custody of the children, knowing that the Department had legal custody." We decline to disturb this factual finding, which is clearly supported by the record.

During the temporary custody hearing, the court explicitly noted that OCS sought "removal from father. So then the plan is that OCS is going to leave the children

---

[22] (...continued)
under AS 11.41).

[23] *See, e.g.*, *Wheeler v. State*, 659 P.2d 1241, 1253-54 (Alaska App. 1983) (explaining the advice-of-counsel defense's application to mental states).

[24] *See* 777 P.2d 636, 647 (Alaska 1989) ("[A]dvice of counsel is not a shield when a party ignores a court order.").

[25] *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1255 (Alaska 2010).

[26] *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008).

in the care of their mother for the time being." At this point, Green objected, indicating that he understood that "somebody is asking this Court to make a decision today." The court found that "it is contrary to [the children's] welfare to remain in Mr. Green's home." Earlier in the hearing, OCS argued that "it is at least provisionally contrary to the welfare of the children to be placed with their father, Mr. Green. The department is not currently seeking removal from" the mother. This evidence was followed by the superior court issuing an initial temporary custody order awarding temporary custody to the mother. Given the evidence in the record, the superior court's factual finding that Green had knowledge of the court order awarding custody to OCS is not clearly erroneous. We therefore reject any contention by Green that advice by Ross must have rendered his conduct at issue unknowing.

## V.    CONCLUSION

We AFFIRM the superior court's order granting the long-term DVPO on behalf of the children against Green.